UNITED STATES of America, ex rel. Frank LAINO, Relator,

v.

WARDEN OF WALLKILL PRISON, Ulster County, New York, Respondent.

United States District Court
S. D. New York.
Aug. 25, 1965.

John R. Davison, Albany, N. Y., Stephen D. Finale, New York City, of counsel, for relator.

Louis J. Lefkowitz, Atty. Gen. for State of New York, Twining & Fischer, Binghamton, N. Y., Robert E. Fischer, Sp. Asst. Atty. Gen., of counsel, for respondent.

TENNEY, District Judge.

Relator is presently incarcerated in Wallkill Prison, Wallkill, New York, pursuant to a judgment of conviction entered December 1, 1961, after a trial by jury at an Extraordinary Special and Trial Term of the Supreme Court, Oneida County in Rome, New York, at which time he was sentenced to a term of five to ten years for each of the crimes of bribery and grand larceny in the first degree and to a term of three and one-half to seven years for the crime of fraudulently presenting bills or claims to public officers for payment, all sentences to run concurrently.

The judgment of conviction was affirmed without opinion by the Appellate Division, Fourth Department, 17 A.D.2d 1029 (4th Dep't 1962), and leave to appeal to the New York Court of Appeals was denied on January 3, 1963 by Associate Judge Stanley H. Fuld. Relator's appeal to the United States Supreme Court was dismissed in a per curiam opinion, and after treating his papers as a petition for a writ of certiorari, the petition was denied by the Court, two Justices being of the opinion that probable jurisdiction should be noted. Laino

v. New York, 374 U.S. 104, 83 S.Ct. 1687, 10 L.Ed.2d 1027 (1963).

On January 28, 1964, a motion by relator in the New York Court of Appeals, addressed to Judge Fuld, for reargument of the prior denial of his motion for leave to appeal, was denied. Thereafter relator petitioned this Court for a writ of habeas corpus, which petition was dismissed by the Honorable Wilfred Feinberg with leave to renew after disposition of an application to be made by relator for reargument in the New York Court of Appeals. United States ex rel. Laino v. Wallack, 231 F.Supp. 733 (S.D.N.Y. 1964). This determination was predicated on two Supreme Court decisions rendered after January of 1964, involving the scope of the privilege against self-incrimination and its application to state procedure. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). In view of those decisions, Judge Feinberg was of the opinion that the New York State courts should have an opportunity to reexamine their prior decisions in the light of the Supreme Court pronouncements.

On July 10, 1964, relator once again applied to Judge Fuld for reargument of the latter's decision of January 28, 1964, which had denied the motion to reargue the prior denial of leave to appeal to the Court of Appeals. In a letter decision of October 14, 1964, Judge Fuld denied relator's application, setting forth therein his reasons for such denial.

Relator now reapplies to this Court for the requested relief, contending that his present incarceration is in violation of his federally-protected rights.

The general historical background does not appear to be in dispute and will be concisely set forth as culled from the papers submitted herein and Judge Feinberg's prior decision. 231 F.Supp. 734–735.

Relator, previous to the proceeding in question, had been convicted in July 1960 after a non-jury trial at an Extraordinary Special and Trial Term of the Supreme Court, Oneida County, of income tax evasion in violation of the Tax Law of the State of New York. This conviction was reversed by the Court of Appeals on July 7, 1961, on the ground that testimony of relator before the Extraordinary Grand Jury (see 231 F.Supp. at 734 n. 3) which had indicted him on the tax evasion counts had been obtained under compulsion of subpoena and used against him at the trial in violation of his privilege against self-incrimination under the New York Constitution (art 1 § 6). People v. Laino, 10 N.Y.2d 161, 218 N.Y.S.2d 647, 176 N.E.2d 571 (1962). The Court further held that, since relator failed to comply with the procedural requirements of the New York immunity statute (Section 2447 of the Penal Law, McKinney's Consol.Laws, c. 40), he could be reindicted "if sufficient evidence, independent of the evidence, links, or leads furnished by [relator] * * * is adduced to support it * * *." 10 N.Y.2d at 173, 218 N.Y.S.2d at 657, 176 N.E.2d at 578.

On December 21, 1960, and January 12, 1961, subsequent to the income tax conviction but prior to its reversal, relator appeared before the original Extraordinary Grand Jury and after executing a limited waiver of immunity testified *inter alia* with respect to the sales by the Laino-Fisk Tire Service to the City of Utica. On January 30, 1961, an additional Grand Jury that had been inquiring into these tire sales and before whom relator never testified handed down the indictment which is the basis of the conviction presently being attacked.

Relator's manifold assertions can be condensed to two main points of reference: (a) the 1959 appearance before the Grand Jury (hereinafter at times referred to as "first Grand Jury appearance"), from which sprang his income tax conviction and reversal by the Court of Appeals; (b) his appearances in 1960 and 1961 before the Grand Jury (hereinafter at times referred to as "second and third appearances" respectively), and the signing of the limited waiver from which sprang the conviction now under attack.

The first point of reference involves not only his first Grand Jury appearance, but also (1) his assertion that his present conviction was obtained as a result of links and leads resulting therefrom; and (2) his further assertion that at trial the trial court improperly placed upon him the burden of proving that links and leads from his prior tainted testimony were used to secure the present indictment rather than placing on the People the burden of disproving this.

Insofar as the second and third appearances are concerned, relator contends that his testimony on those occasions violated his federal and state constitutional right in that the waiver of immunity was improperly obtained, and that the statute upon which it is based is unconstitutional. He apparently further contends that after his first appearance he acquired absolute immunity from prosecution.

The thrust of relator's contentions, as they relate to the 1959 appearance and all that allegedly flows therefrom, do not rise to the level of constitutional violation even if we assume, *arguendo*, that his factual assertions find support in the record. Moreover, on the merits I find that his assertions are not factually tenable in the light of the record submitted herein and the prior decisions by the New York courts.

■ Under New York law, as applied in the reversal of relator's prior conviction, "a prospective defendant or one who is a target of an investigation may not be called and examined before a Grand Jury, and, if he is, his constitutionally-conferred privilege against self incrimination [New York Const. art. I § 6] is deemed violated even though he does not claim or assert the privilege." People v. Steuding, 6 N.Y.2d 214, 216–217, 189 N.Y.S.2d 166, 167, 160 N.E.2d 468, 469 (1959).

■ In his first appearance in 1959, relator was subpoenaed to appear before the Grand Jury, and it was the subpoena which provided the compulsion necessary to automatically raise the constitutional privilege. Accordingly, the Court held that "[i]n such a case [where a prospective defendant is subpoenaed to appear before a Grand Jury] the subpoena is deemed to be a form of compulsion, and the testimony thus compelled may not be used as the basis for an indictment, or for any other purpose." People v. Laino, supra, 10 N.Y.2d at 171, 218 N.Y.S.2d at 655, 176 N.E.2d at 577. In view of this expanded scope of the self-incrimination privilege which is applied in New York,[1] relator's first conviction which resulted from testimony adduced after he was subpoenaed to appear, was held violative of this right and no use could be made of the testimony.

■ While this may very well be the law in New York, it is clear beyond dispute that such is not the law in the federal courts, nor is such an expanded privilege within the scope of the Fifth Amendment as encompassed in the due process clause of the Fourteenth Amendment. Thus, under the Federal Constitution, the mere fact that a prospective defendant is subpoenaed to appear before a Grand Jury does not, without more, violate any federally-protected rights, nor is the testimony given at such time in any way constitutionally tainted. United States v. Winter, 348 F.2d 204 (2d Cir. July 2, 1965) petition for cert. filed, 8/26/65, 34 U.S.L. Week 3081 (9/14/65) (see cases cited therein at n. 5 and n. 6). Accordingly, though the New York Court of Appeals found relator's forced appearance to have violated the New York Constitution, it did not find, nor could it have found, this appearance to have violated the Federal Constitution. Thus there was no abrogation of relator's rights against self-incrimination under the Federal Constitution by reason of the first appearance.

■■ This broadened state standard of the self-incrimination privilege and its violation is "of course not proscribed by Malloy v. Hogan. A State may grant to

---

1. See Sobel, The Privilege Against Self-Incrimination "Federalized", 31 Brooklyn L.Rev. 1, 3, 5 (1964).

its citizens greater (but not lesser) standards than those required by the Fifth Amendment's privilege via the Due Process Clause of the Fourteenth." Sobel, The Privilege Against Self-Incrimination "Federalized", 31 Brooklyn L. Rev. 1, 41 (1964); see also id. at 26, 27. However, by the same token, an abrogation of the broader state protection, which is not violative of the narrower federal protection, cannot be held to constitute a violation of the federally-protected rights, so as to be cognizable on habeas corpus (i. e., a violation of constitutional proportions).

If, after this first appearance, relator were indicted, based on the testimony given before the Grand Jury, would his federally-protected rights have been violated? I think not, for the due process clause embodying the Fifth Amendment privilege presents the minimum standard which no state can abridge. It does not prevent a state from giving broader protection, but, by the same token, if a state gives such broader protection any violation thereof is not an encroachment upon the narrower protected federal sphere.

Accordingly, I am of the view that an intrastate, so to speak, constitutional violation (of the State Constitution) cannot by reason of its being compounded (i. e., the use of the "tainted" evidence) rise to the level of a federal constitutional violation.

▮ Since relator was not compelled, in the federal constitutional sense, to give testimony against himself in his first appearance, there was no violation of his federal privilege, irrespective of what may have been the result under the broader New York State Constitution. Nor did the use of this *federally-uncompelled* testimony constitute any violation.

An analogous, but perhaps more extreme situation, was presented in United States v. Interborough Delicatessen Dealers Ass'n, 235 F.Supp. 230 (S.D.N.Y. 1964), decided after Malloy v. Hogan, supra, and Murphy v. Waterfront Comm'n, supra. In that case, the "prospective" defendants were subpoenaed to appear before an Assistant New York State Attorney General, which, of course, under New York law, automatically violated their New York constitutional privilege against self-incrimination. They were thus protected under New York law to the same extent as was relator after his first conviction and its reversal.

The testimony elicited was then apparently turned over to the federal authorities who used it to indict the defendants for violation of federal law.

The Court held that, even though the defendants had acquired a "limited" immunity by reason of their being "compelled" in the New York constitutional sense to give testimony against themselves, that did not preclude the use of that information by the federal authorities.

In so deciding, the Court was of the view that it is the federal standard that is to be used in defining the meaning of the word "compelled" in the construction of the Fifth and Fourteenth Amendments.[2] "A state may not provide a lesser privilege than that guaranteed by the United States Constitution. * * * Nor may it unilaterally expand the federal privilege outside its own jurisdiction." 235 F.Supp. at 232.

In view of that fact, and since none of the defendants were "compelled" to give testimony against themselves in the federal sense, the Court held that "no one of the defendants is entitled to the protection against self-incrimination provided by the United States Constitution." Id. at 233.

Accordingly, in the case at bar, if relator's initial appearance violated no federal constitutional right, as it did not,

---

2. The reason for this is obvious for to permit each state to define the terms and scope of the federal privilege is to open the door for the intolerable situation of 50 different constructions. The manner in which the state interprets its own privilege is one thing so long as it does not breach the minimum standards of the federal privilege, but permitting the state to affect the metes and bounds of the federal privilege is yet another.

for he at no point was compelled to testify against himself in violation of his Fifth Amendment privilege, it is difficult to see wherein evidence adduced as a result of that apearance is constitutionally tainted.

■ Insofar as relator argues that, as a result of his "compelled" appearance he secured absolute immunity from all further prosecution, and that Section 2447 of the Penal Law and the procedure therein outlined as it relates to him is unconstitutional, his position is equally untenable.[2A]

What relator confuses is the consequence of a violation of his New York constitutional privilege, which, as noted, is broader than the federal privilege, and the statutory grant of absolute immunity from prosecution under Section 2447, which arises under circumstances closely paralleling a violation of the Fifth Amendment privilege against self-incrimination, but the consequences of which are different.

The difference was succinctly stated by Justice Brennan in Matter of Second Additional Grand Jury, 10 A.D.2d 425, 428, 202 N.Y.S.2d 26, 30 (2d Dep't 1960):

"If it be assumed, arguendo, that these appellants are in fact prospective defendants or targets, it then becomes necessary to determine whether section 2447 of the Penal Law was properly and constitutionally applied to them. In considering this question, it is important to remember the essential difference which exists in the nature and extent of the constitutional privilege provided for and conferred by section 6 of article I of our State Constitution and the statutory immunity which is provided for, and which may be conferred, pursuant to section 584 of the Penal Law, as amended, and section 2447 of the Penal Law. Section 6 of article I of the State Constitution provides that no person shall be compelled in any criminal case to be a witness against himself. In the event that this constitutional privilege is violated, the witness is protected not only from indictment based upon any incriminating testimony which he may have given before the Grand Jury, but he is also protected from the use of such evidence. However, by the violation of his aforesaid constitutional privilege, a prospective defendant does not gain absolute immunity from prosecution for the crimes concerning which he may have testified, because these alleged

---

**2A.** Under the procedure outlined in Section 2447, a witness "must (1) *affirmatively claim* his privilege against self incrimination; (2) be directed or ordered to answer by *competent* authority, for instance a Grand Jury at the request of the prosecutor, and (3) testify * * *." People v. Laino, 10 N.Y.2d 172, 218 N.Y.S.2d at 656, 176 N.E.2d at 578. When these requirements are met, absolute immunity follows. What New York has thus adopted is a "claim" immunity statute in that "the immunity is specifically conferred only after the privilege is 'claimed' and the prosecutor exercises the option to either respect the privilege or exchange immunity for it." Sobel, supra, 31 Brooklyn L.Rev. at 18. To hold that an immunity statute which first requires a "claim" of privilege, a direction to answer, and then testimony, is unconstitutional is to render the comparable federal "claim" immunity statutes void as well. See Note, The Federal Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope, 72 Yale L.J. 1569. 1590–1594 (1963) and Appendix of Statutes at 1611–1612; Sobel, supra, at 18.

"With respect to the nature and scope of immunity statutes, federal and state standards are the same. Indeed these have been heretofore constitutionally commanded by our separate constitutional provisions.

With respect to immunity statutes all that the Constitution commands is that if and when immunity is exchanged for the privilege, the immunity granted shall be as broad as the privilege it replaces.

But the Constitution is not concerned with state procedural statutes which specify under what circumstances and procedures the exchange is made.

In this latter respect each jurisdiction may adopt its own standards." Sobel, supra, at 19.

crimes may be resubmitted, for consideration, to another Grand Jury before which the said prospective defendant is not subpoenaed and examined. (People v. Freistadt, 6 A.D.2d 1053, 179 N.Y.S.2d 633, supra; People ex rel. Coyle v. Truesdell, 259 App.Div. 282, 18 N.Y.S.2d 947; People v. Bermel, 71 Misc. 356, 128 N.Y.S. 524, supra; cf. People v. Steuding, 6 N.Y.2d 214, 189 N.Y.S. 2d 166 [160 N.E.2d 468], where this question was expressly left open.) On the other hand, where statutory immunity has been conferred pursuant to, and in accordance with, the grants and procedure contained in the Penal Law, such immunity is full, absolute, and complete in that the incriminating matters disclosed may not be resubmitted to another Grand Jury or otherwise received or considered against the immunized witness or prospective defendant upon any criminal prosecution in this State for any crime disclosed or revealed by the testimony of said immunized witness or prospective defendant. People v. Breslin, 306 N.Y. 294, 118 N.E.2d 108, supra; Matter of Grand Jury of the County of Kings (Nicastro-Chadeayne), 279 App.Div. 915, 110 N.Y.S.2d 532, affirmed 303 N.Y. 983, 106 N.E.2d 63. Thus it may be said that the immunity resulting from the violation of the constitutional privilege contained in section 6 of article I of the State Constitution is a *limited immunity*, whereas the statutory immunity conferred pursuant to the grant and procedure contained in the pertinent sections of the Penal Law, is a *broad or absolute immunity*."

The New York Court of Appeals, in reversing relator's prior conviction held that, while he received "limited immunity" by reason of a violated privilege, he did not receive "absolute immunity" as a result of the statutory immunity provision in Section 2447 of the Penal Law. With this I am in accord. Conceivably, if relator had testified after invocation of his privilege, he not only would have come within the purview of Section 2447 but would have been "compelled" in the federal constitutional sense as well, and therefore an issue of constitutional magnitude would have been presented. However, he did not do so, for if he had then the provisions of Section 2447 would have been held applicable, which was not the case.

Laino was subpoenaed to appear before the Attorney General on March 24, 1959. This he did with counsel but refused to turn over any documents, and was then subpoenaed to appear before the Extraordinary Grand Jury on March 31, 1959. At that time he appeared with counsel who remained outside the Grand Jury room. The initial colloquy between Laino and the prosecutor is fully set forth at 10 N.Y.2d 165–166, 218 N.Y.S. 2d at 650–651, 176 N.E.2d at 573–574, wherein it clearly appears that Laino was fully advised of his rights and the method whereby he should interpose his privilege if he was so inclined. If anything, the prosecutor appears to have informed Laino in a very precise way of the manner in which he could and should assert his privilege as to any question he deemed objectionable.

Generally, the substance of the instructions given by the prosecutor appears to comport with the procedure applicable in the federal courts.

■ Thus the federal privilege against self-incrimination may not be asserted in advance of questions actually propounded. United States v. Harmon, 339 F.2d 354, 359 (6th Cir. 1964), cert. denied, 380 U.S. 944, 85 S.Ct. 1025, 13 L.Ed.2d 963 (1965). This procedure was outlined to relator as well, as was the need to assert the privilege as a particular question was asked. In Re Turner, 309 F.2d 69 (2d Cir. 1962); see United States v. Wortman, 26 F.R.D. 183, 204–205 (E.D.Ill.1960), rather than a blanket statement asserting the privilege. See People v. Laino, 10 N.Y.2d 173–174, 218 N.Y.S.2d at 658, 176 N.E.2d at 579.

The Court of Appeals, in reversing Laino's prior conviction but holding that

Section 2447 was inapplicable, did so by reason of the fact that "[h]e [Laino] *did not interpose his privilege at any time.*" 10 N.Y.2d 166, 218 N.Y.S.2d at 651–652, 176 N.E.2d at 574.

Insofar as the records produced at this first appearance are concerned, prior to their introduction into evidence relator was again specifically advised of the procedure and of his rights.. "If you feel that anything here contained might tend to incriminate you, you have the right to claim your privilege not to permit the introduction of them or the release of them but you must claim that privilege. Again if they are introduced they will be retained. I think the law permits a reasonable time for the opportunity to review them. For that reason, if you desire to claim your privilege you must express it." (Fischer Affidavit in Opposition at 8.) The defendant replied as noted by the Court of Appeals: "Keep everything you got." 10 N.Y.2d 174, 218 N.Y.S.2d at 658, 176 N.E.2d at 579; Fischer Affidavit, supra.

Moreover, after his March 31, 1959 appearance, relator's accountant was subpoenaed to appear and produce records of the Laino-Fisk Tire Service, and Laino was also subpoenaed to bring with him his "Accounts Receivable Ledger". The accountant appeared and without objection brought with him both the records sought of him and the "Accounts Receivable Ledger" asked of Laino. Presumably, between relator's March 31st appearance and the production of the records he had ample opportunity to confer with counsel, but nonetheless he at no time invoked his privilege.

In sum, the Court of Appeals held as follows:

"When he first appeared before the Grand Jury, the defendant in no uncertain terms demanded complete immunity prior to answering any questions. He properly was told that in order to obtain immunity under the statute he would have to refuse to answer a particular question, asserting his privilege against self incrimination, and then answer the question propounded if ordered to do so by the Grand Jury * * *. Defendant then proceeded to testify and never actually interposed his privilege. At no time was he directed or ordered by the Grand Jury to answer a particular question, for at no time did he refuse to answer. Technically, then, the requirements of section 2447 were not met, notwithstanding that the defendant made his position clear, for it is well settled that the privilege against self incrimination may not be asserted or claimed in advance of questions actually propounded (King v. Liotti, 190 Misc. 652, 672, 76 N.Y.S. 2d 98; Matter of Weiner, 183 Misc. 267, 49 N.Y.S.2d 199; Radin v. Kornreich, 17 Misc.2d 860, 41 N.Y.S. 2d 638; People v. Ryan, 6 N.Y.2d 975, 977, 191 N.Y.S.2d 169, 170 [161 N.E.2d 393], dissenting opinion, Burke, J.). When the records were being introduced, the Special Assistant Attorney-General specifically asked defendant if he chose to interpose his privilege as to any, and defendant replied 'Keep everything you got.' The damaging 'accounts receivable ledger' subsequently was delivered pursuant to subpoena, without objection by defendant. As indicated, however, under the Steuding principle, the judgment of conviction should be reversed and the indictment dismissed.

The judgment appealed from should be reversed and the indictment dismissed." 10 N.Y.2d 173–174, 218 N.Y.S.2d at 658, 176 N.E.2d at 579.

As one observer put it, "Laino despite advice and warnings and a specific offer of immunity simply never claimed his privilege." Sobel, supra, 31 Brooklyn L. Rev. at 35.

In view of this uncontradicted record, Section 2447 was held inapplicable. See Sobel, supra at 32. Similarly, in view of the failure to assert any privilege, there was no direction to answer and there was thus no federally recognized compulsion violative of the Fifth Amendment rights.

See Sobel, supra at 40. "If a witness before a grand jury desires the protection of the privilege, he must claim it or he will not be considered to have been compelled to testify within the meaning of the Amendment." United States v. Pile, 256 F.2d 954, 956 (7th Cir. 1958), and, as noted above, relator testified freely without ever asserting any privilege.

Thus relator's testimony was not compelled, it was thus not tainted, nor were links or leads therefrom in any way tainted, and even if used directly to convict him, this in no way constituted an abrogation of any federally-protected rights. To highlight this lack of constitutional infirmity, if we were to take the facts surrounding relator's first Grand Jury appearance and merely change the jurisdiction to that of a Federal Grand Jury, could it be argued that relator's Fifth Amendment rights were in any way violated; i. e., was he "compelled" to give testimony against himself?

To ask the question is to answer it.

■ Moreover, even if we were to assume, *arguendo*, that the testimony of March 31, 1959, was compelled in the federal sense, reindictment would be possible if "sufficient evidence, independent of the evidence links, or leads furnished by the * * * [relator] is adduced to support it." People v. Laino, 10 N.Y.2d 173, 218 N.Y.S.2d 657, 176 N.E.2d 578; see United States v. Pappadio, 235 F. Supp. 887, 890 (S.D.N.Y.1964), aff'd, 346 F.2d 5 (2d Cir. May 24, 1965). Relator contends that the testimony adduced, and its links and leads, were in fact used to reindict him and cause his present incarceration. However, this matter was fully tried before Justice Marsh in a private inquiry held out of the hearing of the jury at relator's trial. After full opportunity was afforded to both sides to fully explore the question, the Justice held as to the items and testimony objected to, that each was secured not as a result of the prior testimony nor any links or leads resulting therefrom. See T.R. 764–765; 2885–2886; 2902–2903;

4380–4386; People's Brief to Appellate Division, Fourth Department at 98–100.

These factual findings were affirmed on appeal to the Appellate Division and were specifically affirmed in Judge Fuld's letter decision of October 14, 1964, wherein Judge Fuld held that after "further thought and study and a careful reading of the record" (Judge Fuld also sat on the income tax appeal of relator) he found that "no tainted evidence was used or relied upon in procuring the defendant's conviction."

All the arguments and evidence presently proffered by relator were presented below and ruled upon by the trial Judge and were thoroughly reviewed and rejected by Judge Fuld. To relitigate these factual issues after full hearing in the State court would be to misconstrue the dictates of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Nor can it be said, after a reading of the trial court's decisions as they related to the evidence objected to, that "the state factual determination is not fairly supported by the record as a whole." Townsend v. Sain, supra, at 313, 316, 83 S.Ct. at 757; see People's Brief on Appeal to Appellate Division, Fourth Department at 101–124,[3] and I accordingly would be inclined to adopt those findings. See United States ex rel. Robinson v. Fay, 348 F.2d 705 (2d Cir., July 22, 1965).

The foregoing would ordinarily terminate the issue. However, relator contends that the decision by the trial court was based on improper federal standards in that the burden of proof was improperly allocated to him to show that links and leads were used to support the conviction, rather than the burden being placed on the people to show the independent source of the evidence, or, as relator argues, to show that no links and leads were used to obtain the indictment or sustain the conviction. (Townsend v. Sain, 372 U.S. at 316, 83 S.Ct. 745.)

**3.** See Trial Record: 145–189; 365–469; 472–656; 659–684; 2553–2557; 2560– 2711; 2748–2886; 2893–2896; 2902– 2904; 2931; 4380–4386.

On the issue of burden of proof, no standard was articulated by the trial Judge, and, as noted, relator asserts that in fact the burden was placed on him. In approaching the question, the following statement in Townsend, supra, at 314–315, 83 S.Ct. at 758, must be borne in mind:

"[T]he coequal responsibilities of state and federal judges in the administration of federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation, properly assume that the state trier of fact applied correct standards of federal law to the facts, in the absence of evidence, such as was present in Rogers v. Richmond [365 U.S. 534, 81 S.Ct. 735, 5 L.Ed. 2d 760], that there is reason to suspect that an incorrect standard was in fact applied."

 Relator's support for his present position[4] is language set forth in the People's brief at pages 95 and 96 and the colloquy between counsel and the trial Judge set out in the Trial Record at pages 103–117.[5]

I am unable to agree with relator's contentions that as a result of these statements it is apparent that the burden of proof of showing links and leads was placed on relator.

The area of law involved herein does not appear to be a novel one, and while Murphy v. Waterfront Comm'n, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)

reemphasized wherein the burden of proof lies, and Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) made the Fifth Amendment applicable to the states, relator has failed to show that the New York rule prior to Murphy in any way differed from the federal rule on burden of proof on this issue. In fact, in the prior reversal the New York Court of Appeals permitted indictment if sufficient evidence independent of links or leads was used, thereby inferring that it was for the people to show the independent source of the evidence so used. See Sobel, supra, 31 Brooklyn L.Rev. at 30.

The analogous federal cases which respondent's counsel avers he looked at prior to the trial and used as a model for the procedure adopted, were wire-tap cases. In these circumstances it has been held, though in different language, that it is for the Government to show that the indictment and evidence resulted from sources independent of any tainted evidence. See, e. g., United States v. Tane, 329 F.2d 848, 853 (2d Cir. 1964); United States v. Coplon, 185 F.2d 629, 636, 28 A.L.R.2d 1041 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952); cf., United States v. Avila, 227 F.Supp. 3 (N.D.Calif.1963).

In United States v. Pappadio, 235 F. Supp. 887, 890 (S.D.N.Y.1964), aff'd, 346 F.2d 5 (2d Cir. May 24, 1965), a Fifth Amendment case, Judge Herlands of this Court held as follows: "Should the Government try the witness under the pending indictment, the burden would be on the Government to prove, clearly and con-

---

4. It must be noted that this issue of improper allocation of the burden of proof was never raised in the state courts prior to the application before Judge Feinberg and was thereafter raised for the first time in those courts in the last motion to reargue before Judge Fuld. Moreover, no objection was taken at any time during the trial to the procedure adopted; in fact, it was affirmatively consented to by counsel.

5. In his traverse to the amended return, relator for the very first time annexes the affidavits of his trial counsel wherein they aver that in an off-the-record discussion the trial Court specifically informed

them that the burden of proof was upon them. These facts not only have never been submitted to the State courts, but were not submitted in the mass of papers in the prior application to Judge Feinberg, nor were they included in the initial 100 pages of affidavit and memorandum initially submitted to me. Aside from the shadow thus cast on these "newly discovered facts" it is apparent that they have not been presented to the New York courts and since they are *dehors* the record they can be presented by way of a request for collateral relief in a writ of error *coram nobis*.

vincingly, that all its proof is derived from sources completely independent of the witness's grand jury testimony, and any clues or leads derived from such testimony.

The burden would be upon the Government to establish the negative fact that none of its evidence is the fruit of the protected tree of the witness's immunized testimony."

But how is this done? Surely not by mere denials by the People, but rather by showing "just how its case has been prepared." United States v. Goldstein, 120 F.2d 485, 488 (2d Cir. 1941), aff'd, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942). For Proof of the positive, i. e., the independent source of the evidence used, precludes existence of the negative, i. e., that it had a tainted source, especially where as here attempts were made on cross-examination of the witness Weintraub, an Assistant Attorney General, to show that tainted evidence was in fact used. In the case at bar this was the precise method utilized to show the independent source of the evidence forming the basis of the indictment and introduced at trial. For as was revealed at the private inquiry, most if not all of the evidence used was known prior to Laino's first appearance in March, 1959.

The statements alluded to by relator at best referred to the procedure employed and to the prima facie showing necessary or to the burden of going forward with an initial showing, which burden may have been placed on him but which is quite different from the ultimate burden of proof on an issue.[6]

Thus in Murphy v. Waterfront Commission, 378 U.S. 52, 92, 103, 84 S.Ct. 1594, 1616 (1964), Justice White stated in a concurring opinion: "As in the analogous search and seizure and wiretap cases—where the burden of proof is on the Government once the defendant establishes the unlawful search or wiretap,

United States v. Coplon, 185 F.2d 629 [28 A.L.R.2d 1041] (C.A.2d Cir.); United States v. Goldstein, 120 F.2d 485, 488 (C.A.2d Cir.), aff'd, 316 U.S. 114, [62 S. Ct. 1000, 86 L.Ed. 1312] once a defendant demonstrates that he has testified in a state proceeding in exchange for immunity to matters related to the federal prosecution, the Government can be put to show that its evidence is not tainted by establishing that it had an independent, legitimate source for the disputed evidence."

Or, as stated by Judge Frank in Lapides v. United States, 215 F.2d 253, 257, 261 n. 10 (2d Cir. 1954) (dissenting opinion) "[i]f, at trial of his injunction suit, Lapides proved that the government got disclosures from him through an immunity-promise, he would establish a *prima facie* case, i. e., the burden would be on the government to prove that none of the evidence it proposed to use in seeking appellant's indictment had stemmed from this tainted source."

■■■■■■ In the case at bar the prosecution denied that it had used any tainted evidence or links or leads resulting therefrom. This is obviously not sufficient, for the prosecution must and did show to the satisfaction of the trial Judge the source of its evidence, i. e., that it was from an independent and not a polluted source. In other words, as Mr. Justice White stated in Murphy, supra, the prosecution showed that its evidence was not tainted "by establishing that it had an independent, legitimate source for the disputed evidence." The defendant may very well have had the burden of making the prima facie or initial showing alluded to above of delineating the area of inquiry and perhaps showing that these matters had been covered in his prior Grand Jury appearance; however, the prosecution was allocated the ultimate burden of proving by clear and convinc-

---

6. Relator's trial counsel stated that the discussion related solely to the procedure adopted to develop the issue. In fact, the procedure of waiting until after the direct examination for the inquiry was pursuant to relator's counsels' request. (T.R. 108) As noted above, both counsel and the defendants approved of the procedure adopted.

ing evidence the independent and non-tainted source of its evidence.[6A]

That this was the fact is clearly revealed by the ruling of the trial Judge on the specific matters objected to. Thus, for example, the Judge, in overruling the relator's objection as it related to his bank deposit slips, held as follows:

"The Court will rule that by reason of the investigations conducted by the People prior to the appearance of the defendant, Laino, before the Grand Jury, and the information secured by the People from such investigations as revealed here, and on the whole record of the preliminary inquiry now before the Court, the Court overrules the objections of defendant's counsel, and denies a motion to strike on its finding that such evidence which as was objected to here by counsel, was independent of the evidence given by the defendant before the Grand Jury, prior to his signing a waiver of immunity, and that its procurement by the People was not dependent on or a consequence of any links or leads furnished by the defendant on such appearance, prior to signing a waiver." 2885–2886.

The trial court thus specifically found the positive, i. e., the independent source of the evidence, as well as the negative, i. e., that it was not a fruit of the tainted source. That the burden was on the prosecution to make this showing is implicit if not explicit in this finding.

For if the burden had in fact been placed on relator the Court would have found that there was an insufficient showing that links and leads were used, whereas the finding above was an affirmative one, namely, that the evidence produced had a source independent of relator's Grand Jury testimony and that it was procured in a manner not dependent on that testimony or any links or leads therefrom.

Moreover, and of prime importance, is the decision by Judge Fuld.[7] In his denial of the second motion to reargue, Judge Fuld stated as follows:

"Dear Mr. Davison:

Following receipt of the various additional papers you sent me, including the opinion rendered by Judge Feinberg in the habeas corpus proceeding, I gave further thought and study to your second application on behalf of the defendant Laino for reargument of his motion for leave to appeal to the Court of Appeals.

I doubt if there is much, if any, disagreement on the questions of law presented. I have all along assumed the law to be, in the main, as Judge Feinberg, Mr. Levine (who previously represented the defendant) and you have set it forth. My denial of leave, as well as of your initial application for reargument, was predicated on a careful reading of the record, which persuaded me (as apparently it did the courts below) that the People had established that no 'tainted' evidence was used or relied upon in procuring the defendant's conviction.

The further consideration I have given the case has failed to alter that conclusion and, accordingly, your present motion for reargument is denied."

Accordingly, Judge Fuld held that the burden was properly placed not on relator but rather on the People, that the proper standards alluded to by Judge Feinberg had in fact been applied, and that the People had shown that no tainted evidence was in fact used or was the basis of other evidence produced.

---

**6A.** See Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); see also Murphy v. Waterfront Comm'n, supra, 378 U.S. at 79, n. 18, 84 S.Ct. 1594.

**7.** This ruling is all the more significant in view of the fact that the Judge involved had sat on the tax appeal and had reviewed the record on the prior applications made by relator in this conviction. His intimate knowledge of the record is revealed by Laino's counsel's letter of September 18, 1964.

In view of all these facts, relator's contentions as they relate to the March 1959 appearance and all that emanated therefrom are rejected.

Relator's additional argument that as a result of this first appearance he received absolute immunity from prosecution needs little comment since he again confuses the statutory grant of immunity with the consequences of a violated privilege. Even if this first appearance violated not only the New York Constitution but the Federal Constitution as well, the protection accorded to him covered the testimony adduced and any links or leads therefrom,[8] which is quite distinct from the statutory grant of immunity, either state or federal, which, as noted above, is absolute in the sense that the individual receives absolute immunity from prosecution for any crime revealed during the course of his testimony.[9]

 Relator also raises herein for the first time a claim relating to wiretap evidence secured in violation of Section 605 of the Federal Communications Act. Aside from the fact that this issue was not raised prior to the instant application, the wire-tap was performed in accordance with New York State law, and, accordingly, though perhaps a violation of federal law, it is not an abridgement of any federally-protected constitutional rights. See Schwartz v. State of Texas, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231 (1953); United States ex rel. Griffin v. Hendrick, 217 F.Supp. 865 (E.D.Pa.1963).[10]

I next turn to the second point of reference, namely, relator's second and third appearances before the Grand Jury on December 21, 1960, and January 12, 1961. As to these two appearances, the thrust of relator's attack is directed to (a) whether he voluntarily signed a waiver of immunity; (b) the constitutionality of the statute pursuant to which the waiver was signed.

The first issue to be resolved is whether as a factual matter, and assuming the validity of the statute, the waiver was voluntary; the second issue, assuming a voluntary waiver, would then necessarily involve the constitutionality of the statute.

During the course of the trial, at the time that the waiver and the testimony secured by reason thereof were sought to be introduced, relator's counsel objected to the proffer on the same grounds advanced herein, i. e., voluntariness and constitutionality. A preliminary inquiry was held before Justice Marsh, outside of the hearing of the jury, which consumed some one hundred pages of the trial record (T.R. 685–766). Witnesses were called and both sides afforded a full opportunity to be heard, and apparently there is no information presented herein which was not or could not have been presented at that hearing. At the conclusion of the inquiry Justice Marsh, in a lengthy oral opinion, overruled the objection, finding the waiver voluntary and the statute constitutional.

 A reading of the transcript reveals that the "state factual determination is * * * fairly supported by the record." Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 757 (1963). It is further clear "that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings," Townsend v. Sain, supra, at 318, 83 S.Ct. at 760 and while under such circumstances it is by no means incumbent upon me, the federal court "may, and ordinarily should, accept the facts as

8. See Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); People v. Laino, supra; United States v. Pappadio, 235 F.Supp. 887 at 890; Sobel, supra, 31 Brooklyn L.Rev. at 29.

9. See Sobel, supra, at 14–15; United States v. Pappadio, (reported at 346 F. 2d 5, 8 (2d Cir. 1965), petition for certiorari filed, 8/10/65, 34 U.S.L. Week

3072 (8/24/65)); see also Note 2A supra.

10. I do not read the decision by our Court of Appeals in United States ex rel. Ross v. LaVallee, 341 F.2d 823, 824 n. 2 (2d Cir. 1965) as questioning the continued validity of the Supreme Court's decision in Schwartz v. State of Texas, supra.

found in the hearing." Ibid. I am of the opinion that the record fully supports Justice Marsh's findings of fact, i. e., voluntariness, and, accordingly, they will not be reviewed herein.

Briefly summarized, it appears that the City of Utica, New York, had advertised for bids for a contract for the removal of garbage and ashes (hereinafter referred to as "garbage contract"), and that three parties had submitted bids, one of them being relator. The contract was for $750,000, covering a period of three years, and relator's bid was the lowest. The next lowest bidder immediately protested that relator was not qualified to bid because of his connection with Nick Laino & Sons, Inc., which firm had held the garbage contract until 1960 but had been disqualified pursuant to the provisions of Section 103–b of the General Municipal Law, McKinney's Consol. Laws, c. 24 for refusing to execute a limited waiver of immunity as provided by that statute.

By reason of this protest, the Corporation Counsel of the City of Utica, Lawrence Tumposky, was requested by the City Board of Contract and Supply to render an opinion as to the possible disqualification of relator. Tumposky contacted the Attorney General's Office, requesting information in the possession of the Attorney General's Office as to the firm of Nick Laino & Sons, Inc., since it was the Attorney General's Office that had certified the disqualification of that firm to the City of Utica. Tumposky met with Special Assistant Attorney General Fischer on December 19, 1960, and then wrote a letter to Fischer embracing what they had discussed and requesting the information sought. Tumposky received a reply from the Attorney General's Office which, *inter alia*, quoted relator's

testimony in his first Grand Jury appearance of association with Nick Laino & Sons, Inc. (which was then a matter of public record) and also set forth Laino's prior conviction and sentence, the possibility that relator would be required to serve a term in prison, and the fact that an appeal was then pending. The letter stated that these facts were being called to Tumposky's attention in view of the garbage bid specifications of personal supervision, a subject that had been discussed by Tumposky and Fischer at their December 19th meeting. It further stated the intention of the Attorney General's Office to have all three bidders to the contract appear before the Grand Jury and have submitted to them prior to receiving their testimony limited waivers of immunity for signature and acknowledgment pursuant to Section 103–b of the General Municipal Law.[11]

This reply was mailed on December 21, 1960, and received by Mr. Tumposky on December 23, 1960. On December 21, 1960, relator was called before the Grand Jury; the other two bidders were summoned as well. On December 23, 1960, Tumposky rendered an opinion wherein he stated that Laino was not disqualified from the contract although the Board of Contract and Supply had discretion to award the contract to the next lowest bidder by reason of the possibility that Laino could not personally supervise the contract as required. At the request of Jacob Goldbas, Laino's attorney, a decision on the contract was deferred until December 27, 1960.

On December 21, 1960, Laino appeared with counsel before the Grand Jury and was asked to sign a waiver of immunity pursuant to Section 103–b of the General

---

11. Parenthetically, the Executive Order under which the Attorney General and the Grand Jury were operating requires the Attorney General in person or by assistants to attend before Grand Juries in matters relating *inter alia* to:

"(d) any and all acts heretofore or hereafter committed or omitted, or alleged to have been committed or omitted, in the County of Oneida, in violation of any provision of law, or by any person or corporation having directly or indirectly any business, relations or transactions with the County of Oneida or any subdivision thereof or any political or civil entity situated therein, or with any official, officer, agent or employee thereof."

Municipal Law which, in pertinent part, provides:

"Any person who, when called before a grand jury to testify concerning any transaction or contract had with the state, any political subdivision thereof, a public authority, or with a public department, agency or official of the state or of any political subdivision thereof or of a public authority, refuses to sign a waiver of immunity against subsequent criminal prosecution or to answer any relevant question concerning such transaction or contract, and any firm, partnership or corporation of which he is a member, partner, director or officer shall be disqualified from thereafter selling to or submitting bids to or receiving awards from or entering into any contracts with any municipal corporation or fire district, or with any public department, agency or official thereof, for goods, work or services, for a period of five years after such refusal or until a disqualification shall be removed pursuant to the provisions of section one hundred three–c of this article."

The waiver which relator signed provides that he does specifically and

" * * * expressly waive all immunity and the privilege, which I would otherwise obtain, by giving testimony herein, from indictment, prosecution, punishment, penalty or forfeiture, for or on account of or relating or in respect to any transaction, matter or thing which I may testify or produce evidence, documentary or otherwise, in the investigation above entitled, or in any other investigation, or any inquiry, trial, action, investigation or other proceeding, before any magistrate, judge or justice, court or other tribunal, grand jury or otherwise, conducting an inquiry or legal proceeding relating to the above investigation. This waiver is limited to those matters required to be waived pursuant to Section 103–b of the General Municipal Law, a copy of which is attached hereto."

Laino, further, did specifically and " * * * expressly waive any and all privilege which I would otherwise obtain against the use against me of the testimony so given or the evidence so produced upon any criminal investigation, prosecution or proceeding."

Laino signed the waiver after conferring with his attorney and on the apparent advice of counsel that he had to testify if he wanted the contract.

The scope of the inquiry covered not only the garbage contract but prior tire dealings and transactions between Laino and the City of Utica as well. Prior to his signing the waiver, Laino was never informed that the questions would relate only to the garbage contract; in fact, he was on notice that the inquiry could cover "any transaction" with the City as the waiver made specific reference to any transaction, and, more important, the statute—a copy of which was annexed to the waiver—very clearly stated that it relates to "any transaction or contract." When the line of questioning went into the area of tires, Laino was given the opportunity to again discuss the waiver with his attorney. After that consultation he returned and stated that he would continue to testify. "The only advice my attorney gave me was that I have immunity and for me to testify." Further questioning elicited the fact that he had signed the waiver voluntarily and that he was willing to testify.

At no point did relator indicate that he did not understand the scope of the waiver or of the statute, nor was he misled in any way by the prosecutor. Thus, in legal effect, relator signed the waiver knowing that "any transaction" [i. e., tires] that he had previously conducted with the City could be discussed or at least he and/or his attorney were charged with that knowledge, under a plain reading of the statute and the waiver.

█ As noted above, the advice of his attorney was to testify since he had

immunity. Apparently the attorney had in mind either the notion that the waiver was ineffective by reason of an unconstitutional statute, or that by reason of relator's first Grand Jury appearance (which had not as yet been declared improper) and the "compelled" testimony before that body, relator would receive immunity from further prosecution. Insofar as the constitutionality of the statute is concerned, that would have no effect on the factual determination of voluntariness which is now being discussed, since relator nonetheless voluntarily signed the waiver pursuant to the advice of counsel. The opinion with respect to the first Grand Jury appearance and its immunizing effect was a calculated decision made by a trained attorney, which, in retrospect turned out to be incorrect. Relator, however, cannot now be heard to complain by reason of that decision and advice.

This faulty advice is no reason for discharge on habeas corpus nor is it a reason to attack the voluntariness of the waiver. No averment is, nor could be, made with respect to the competency of his counsel. The cases are legion wherein a particular strategy or course of conduct is undertaken by a defendant on the advice of his attorney, which, in the end, turns out to have been the incorrect procedure.

Laino followed the advice and opinion of his attorney and signed the waiver initially and continued to testify under the waiver with respect to his prior tire transactions with the city.

Relator also argues that he signed the waiver since at his prior trial he had been informed by the trial court that he had not received immunity by reason of his "compelled" Grand Jury testimony, which also covered, in part, tire sales. On the other hand, however, he asserts that when he signed the waiver he did not know that other transactions would be gone into, thinking that the only scope of inquiry was the garbage collection contract. Either relator was cognizant of the fact that the questioning would cover his prior transactions and he signed the waiver because on his first trial he had been judicially informed that he had received no immunity from prosecution due to his Grand Jury testimony (which, as noted, had in part covered tires), or he was ignorant of the fact that the inquiry would go beyond the garbage contract (which had not, of course, been covered in his prior Grand Jury appearance), and therefore the waiver was involuntary. But to argue both sides of the coin is to negate the truthfulness of either.

The other two bidders also appeared before the Grand Jury and testified after having executed limited waivers of immunity pursuant to Section 103–b.

On December 27, 1960, the contract was awarded to the second lowest bidder. Thereafter, on December 28, 1960, Laino was subpoenaed to appear before the Grand Jury on December 29, 1960. A motion to quash the subpoena was made returnable on January 9, 1961 and denied by reason of the fact that the Judge before whom the motion was argued could not anticipate the line of questioning of the Grand Jury. Relator appeared on January 12, 1961.

A reading of the transcript of this appearance reveals the precise instructions of the Prosecutor (which I might note have not been shown to have been incorrect), and relator's seeming confusion, not as to the scope of the waiver or the procedure to be followed in refusing to answer a question as being without the scope of the waiver, but rather as to the terminology to be employed in objecting to a particular question. Relator was again afforded a full opportunity to confer with counsel at the suggestion of the Special Prosecutor. After returning, relator stated that he had no questions.[12]

12. He now asserts that he was unable to explain to his attorney what had transpired in the Grand Jury room. His attorney avers to that effect in an affidavit submitted. No attempt was made by Laino's counsel to ascertain from Wein-

Laino at no time sought to revoke the waiver or refuse to answer any questions. He asserts, however, that after the garbage contract was awarded to another he should not have been compelled to appear and testify before the Grand Jury.

■ At no time did the Attorney General either state or infer that the testimony sought to be elicited related only to the garbage contract. In fact, the waiver and the statute would lead to an opposite conclusion. Nor was there any indication that relator would be questioned only so long as his bid was being considered and not thereafter. His appearance was to be eight days after his second one on December 29, 1960, before the same Grand Jury, and the area of questioning was essentially the same. Merely because he signed the waiver with a certain state of mind does not, *ipso facto*, give him the right to call halt when the underpinning for that state of mind, i. e., the contract, is thereafter removed. In effect, relator argues that at the very moment that the contract was awarded to another, the Grand Jury's interest in him ceased. Such a conclusion is untenable. Since the appearance was at a point so close in time to the prior one, before the same body and relating to the same general subject matter, the fact that in the interim relator's bid had been rejected is irrelevant to the propriety of his being resummoned,[13] and is only relevant if at all to the extent that it reflected on his state of mind and motivation in signing the waiver.

In effect, relator would give a witness called before a Grand Jury, and

who had voluntarily executed a waiver of his privilege, the power to stop questions by the Grand Jury that he considered to be of danger merely by withdrawing his bid, or resigning from public office and thereby, *eo instantio*, revoking his prior executed waiver.

■ Assuming the validity of the statute pursuant to which the waiver was executed, relator had thereby voluntarily waived certain rights that he possessed just the same as if he had voluntarily testified without invoking his privilege.

"Appellant knowingly waived his privilege against self-incrimination with respect to city affairs. * * * Having taken advantage of the waiver to hold his job [or not to be disqualified under Section 103-b] and having already undertaken to disclose his financial affairs to the Grand Jury, appellant cannot cry halt because the inquiry has gone into greater depth than he had anticipated. Once he waives his privilege against self-incrimination, a witness may not withdraw his waiver to prevent matters which he has already gone into from being explored in greater detail. [Citing cases.]" United States ex rel. Carthan v. Sheriff, 330 F.2d 100, 102 (2d Cir.), cert. denied, 379 U.S. 929, 85 S.Ct. 323, 13 L. Ed.2d 341 (1964).

Similarly having waived his privilege, he cannot thereafter by reason of circumstances extraneous to the Grand Jury proceedings (rejection of the bid) affecting solely his subjective state of mind, take the position that the Grand Jury can delve no further into his affairs covered by the waiver since his personal

traub (the Special Prosecutor) what had transpired and what the difficulty was, nor did Laino on his return to the Grand Jury room even intimate that he did not understand what Weintraub had told him or that his attorney wanted to confer with Weintraub. A reading of the transcript would not lead one to believe that there was any problem in communication between counsel and Laino and between Laino and Weintraub.

13. People ex rel. Hofsaes v. Warden, 302 N.Y. 403, 98 N.E.2d 579 (1951); Ap-

plication of Second Additional March 1958 Grand Jury, 21 Misc.2d 1067, 198 N.Y.S. 2d 112 (County Ct.1960). In Regan v. People of State of New York, 349 U.S. 58, 75 S.Ct. 585, 99 L.Ed. 883 (1955), the Court did not reach the issue of the continued use of a waiver of immunity after public employment has ended. See Bender's New York Evidence C.P.L.R. § 243.03 n. 5 (1963); United States ex rel. Stevens v. McCloskey, 345 F.2d 305 (2d. Cir. 1965), certiorari·granted 86 S.Ct. 53.

reasons for signing the waiver are no more.

Based on this record, Justice Marsh [14] overruled the objection thusly:

"The Court, at this time, overrules the objections of defendant's counsel to the admissibility of the waiver of immunity offered by the People, which may be received in evidence for the purposes of this hearing, and marked as People's Exhibit 1 in evidence. It appears that on the occasion of the defendant, Laino's appearance before the Grand Jury on December 21st, 1960, before giving any testimony, and after conferring with counsel concerning the contents of the proposed waiver of immunity, that the defendant signed the same and acknowledged it before a Notary Public. What his attitude of mind or his counsel's, Mr. Goldbas' attitude of mind was at that time, toward the threatened invocation of the public authorities— by the public authorities of the penalty provisions of Section 103-b of the General Municipal Law, or what their concept of the statute's constitutionality was at that time, is of no concern to this Court. Either the statute was a constitutionally valid and effective exercise of legislative authority to lay down conditions applicable to those seeking public business, or it was unconstitutional and ineffective for any purpose, thus posing no coercive threat to the defendant. After a full opportunity to examine and discuss the provisions of the waiver with his attorney, including the area of inquiry, he signed it. He makes no claim now that the provisions were not understood by him, nor did he at the time of signing, make such claim. Had the defendant refused to sign on advice of counsel or otherwise, then upon the penalty provisions of the statute being invoked, defendant might assert the constitutional question now raised. The provisions of the statute never having been invoked, we are not now concerned with its constitutionality. The defendant having waived immunity and consented to the use of any evidence subsequently given by him before the Grand Jury, within the prescribed area of inquiry, the Court finds without merit, and overrules defendant's objection to the introduction of such evidence on this trial, or evidence obtained as a consequence of links and leads emanating from such evidence." (T.R. 762–764)

Assuming, as I have, the validity of Section 103-b, I am in accord with Justice Marsh's factual finding of voluntariness of the waiver. Relator, after conferring with able counsel, and understanding full well its ramifications, voluntarily and intelligently relinquished

---

14. It appears that the issue of voluntariness of the waiver was determined only by Justice Marsh and not thereafter submitted to the jury. No objection was made to this procedure during the trial nor is the issue raised herein. In effect, then, what is presented is the reverse of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), without the shortcomings therein decried by the Court. A similar problem was presented in People v. Guidarelli, 22 A.D.2d 336, 255 N.Y.S.2d 975 (3rd Dep't 1965), wherein the case was remanded for a hearing pursuant to People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E. 2d 179 (1965).

While the procedure of having the trial Judge alone pass on the voluntariness of the waiver may very well contravene the New York constitutional provision of trial by jury (Art. 1 § 2) (Siegel, The Fallacies of Jackson v. Denno, 31 Brooklyn L.Rev. 50, 58 (1964), it does not constitute that type of a constitutional deprivation cognizable on this writ. For it is merely one form of the Wigmore or "Orthodox" rule under which the trial Judge alone determines voluntariness and the jury considers the testimony of that preliminary hearing only on the issue of weight and/or credibility (see Siegel, supra, at 52–53), which is the rule applied in many jurisdictions (ibid. at n. 9); Jackson v. Denno, 378 U.S. at 396–401, 84 S.Ct. 1774.

his rights by executing the waiver, and the mere fact that things did not turn out as he had hoped is no reason to now cry foul. The trial court's findings are fully in accord with the standards laid down in Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and will be adopted by me.[15]

■ We now proceed to the asserted unconstitutionality of Section 103-b of the General Municipal Law of New York.[16]

The statute here under attack was added to the General Municipal Law in 1959. A similar statutory provision was added to the State Finance Law to cover persons doing business with the State (State Finance Law § 139-b, McKinney's Consol. Laws, c. 56) and to the Public Authorities Law to cover persons doing business with a public authority of the state or any political subdivision thereof. (Public Authorities Law § 2602, McKinney's Consol. Laws, c. 43-A.)

The need for this legislation was set forth in the Memorandum of the Attorney General, wherein he stated:

"The Extraordinary Grand Jury conducting an investigation in Ulster County, on January 28, 1959 handed up a presentment pointing out that its inquiry had been blocked by the refusal of persons who had been selling merchandise and equipment to the county to give testimony about their dealings with public officials. It recommended legislation to meet that problem. This bill is such legislation." (Memorandum of the Attorney General, N. Y. State Legislative Annual 1959, at 148.)

In addition to the above-mentioned statutes, there is a constitutional amendment existent in New York which, in part, provides that any public officer who, upon being called to testify concerning the conduct of his present office or any public office held by him within five years prior to the time he is called to testify regarding the performance of his public duties, refuses to execute a waiver of immunity against subsequent prosecution, shall, by virtue of such refusal, be disqualified from holding any other public office or employment for five years, or shall forfeit his present office at the suit of the Attorney General. (N.Y.Const. art. 1 § 6 (Supp. 1964)). Section 1123 of the New York City Charter provides in a similar vein that in the case of any councilman, of-

---

15. Relator urges also that the finding of the trial Judge of voluntariness was not beyond a reasonable doubt, as is required by Jackson v. Denno, supra. See People v. Langert, 44 Misc.2d 399, 254 N.Y.S. 2d 17, 20 (S.Ct.1964).

The trial Judge articulated no standards but there is no reason to believe that improper standards were used. Townsend v. Sain, 372 U.S. 314–315, 83 S.Ct. 745 (1963). Prior to Jackson v. Denno, supra, the issue of voluntariness of a confession was submitted in the first instance to the jury, but their finding on that issue as well as all issues in a criminal case was beyond a reasonable doubt. Stein v. People of State of New York, 346 U.S. 156, 173 n. 17, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953). It is therefore not apparent why we should assume that the Judge deciding the issue alone would apply a standard different than the one that he charges the jury to follow.

Moreover, there is ample authority for the proposition that a "waiver [of constitutional privilege] is to be found only upon clear proof thereof. See Himmelfarb v. United States, 175 F.2d 924, 931 (9 Cir.1949)." United States v. H. P. Hood & Sons, Inc., 215 F.Supp. 656, 657 (D.Mass.1963), rev'd on other grounds, sub nom. United States v. Welden, 377 U.S. 95, 84 S.Ct. 1082, 12 L.Ed.2d 152 (1964).

16. In the normal case where suit is brought to attack the constitutionality of a state statute and enjoin is enforcement, this Court is directed by Section 2281 of Title 28 of the United States Code to convene a three-Judge Court. However, such does not appear to be the case where on a petition for a writ of habeas corpus the unconstitutionality of a statute is asserted. See United States ex rel. Watkins v. Commonwealth of Pennsylvania, 214 F.Supp. 913, 916–917 (W.D.Pa.1963); United States ex rel. Murphy v. Warden, 29 F.Supp. 486 (N.D.N.Y.1939). But see United States ex rel. Kloiber v. Myers, 237 F.Supp. 682 (E.D.Pa.1965).

ficer or employee of the City who refuses to waive immunity from prosecution in the areas therein delineated, his term or tenure of office is terminated and he is thereafter ineligible for future city office or employment.

A comparable statutory enactment was added to the New Jersey statutes in 1953 which covers either elected or appointed officials, or any state, county or municipal employee. It is therein provided that any such individual who refuses to answer any question relating to his office on the ground that the answer might tend to incriminate him, or refuses to waive immunity, shall, if holding office, be removed therefrom or forfeit any future right of tenure or pension, provided that the inquiry relates to a matter which arose within the preceding five years. N.J.Stat.Ann. § 2A:81–17.1 (Supp.1964).

The State of Louisiana has a constitutional amendment similar to art. 1 § 6 of the New York State Constitution (La. Const. Art. XIV § 15(P)(1)), as well as a section of its code relating to persons who enter into a contract with the state and refuse to testify as to matters affecting that contract. (La.Rev.Stat.Ann. § 38:2182 (1950)).

The District of Columbia, as well, has a section of its statute which provides for forfeiture of office by public employees who refuse to answer on the ground of self-incrimination questions relating to their public duties put during a proceeding where they are called either as witnesses or as a defendant. (D.C.Code § 1–319 (Supp.1958)).

It is therefore clear that the statute in question and its counterparts in New York are by no means unique to this jurisdiction.[17]

Both prior,[18] and subsequent,[19] to Malloy v. Hogan, *supra,* the courts have found, even absent such a statutory enactment,[20] a valid reason for the dismissal of a Government employee who refuses to testify concerning affairs transacted while he was in the public employ. While cases involving persons contracting with the state have not been found, I am of the opinion that the same rationale heretofore applied in sustaining statutes relating to public employees is applicable to public contractors. The same holds true for the rationale applied when the power of removal and/or disqualification was found not in any statute but rather in the inherent police power of the state and/or municipality.

Accordingly, in analyzing the constitutionality of Section 103-b, if the sanction provision therein can be upheld (and it has been upheld in the analogous public employee statutes), then the use of testimony secured by reason of the execution of a waiver, executed for fear of that sanction, is equally not constitutionally tainted.

 The Supreme Court has recognized that public bodies have the right to expect public employees to give frank replies to questions relevant to an employee's fitness to hold public office. Beilan v. Board of Public Educ., 357 U. S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958); Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951); Slochower v. Board of Higher Educ., 350 U.S. 551, 558, 76 S.Ct. 637, 100 L.Ed. 692 (1956), and statutes similar to the one herein have thus been upheld. See United States ex rel. Carthan v. Sheriff, 330 F.2d 100 (2d Cir.), cert. denied, 379 U.S. 929, 85 S.Ct. 323, 13

17. See generally, Wigmore §§ 2275(a) (1) n. 4, 2272 n. 18 (McNaughton rev. 1961).

18. See, e.g., United States ex rel. Carthan v. Sheriff, 330 F.2d 100, 101 (2d Cir.), cert. denied, 379 U.S. 929, 85 S.Ct. 323, 13 L.Ed.2d 341 (1964) and cases cited therein; Slochower v. Board of Higher Educ., 350 U.S. 551, 558, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

19. See, e.g., Gardner v. Murphy, 46 Misc. 2d 728, 260 N.Y.S.2d 739 (S.Ct.1965); Callahan v. New Orleans Police Dep't, 171 So.2d 730 (La.Ct.App.1965). See also State v. Naglee, 44 N.J. 209, 207 A.2d 689 (1965).

20. See, e.g., Christal v. Police Comm'n, 33 Cal.App.2d 564, 92 P.2d 416 (1939); Drury v. Hurley, 339 Ill.App. 33, 88 N.E 2d 728, and cases cited therein at 732–734 (2d Div.1949).

L.Ed. 341 (1964). In the case at bar, the questions were asked by a state investigative body, delving into the area of contracts with public bodies, were relevant to the subject of inquiry and were germane to relator's fitnes and qualifications to conduct business with the state. Garner v. Board of Public Works, *supra;* compare Slochower v. Board of Higher Educ., *supra,* 350 U.S. at 558, 76 S.Ct. 637.

The requirement in Section 103b, that public contractors waive immunity before investigative bodies on the sanction of possible disqualification, has the same valid basis as those involving public employees.[21]

Accordingly, it can be argued that the sanction of possible disqualification present in Section 103-b is predicated on the lack of candor and frankness which is expected of one doing business with the state, and that such lack of cooperation and failure to discharge one's responsibility is incompatible with the position held, rather than a disqualification, *eo instantio,* based solely on one's invocation of his Fifth Amendment right. This rationale is, of course, the saving grace whereby prior sanctions of this nature have withstood judicial scrutiny.

Thus the sanction provision may be said to come into play not by reason of an inference of wrongdoing arising from a refusal to sign a waiver, but rather as a result of the incongruity of a "quasi"-public official in a position of trust obstructing an inquiry into his public affairs, action wholly inconsistent with the confidence that necessarily reposes in him.

Nor is it unconscionable to require public servants to forego certain rights when entering public service, and, if they refuse, to be subject to possible removal and/or disqualification.

The state has a legitimate interest in excluding from office those who would impair efficiency and honesty in government operations. This cannot be doubted. To achieve this end conditions and penalties can be imposed even where they may involve the relinquishment of constitutional rights and privileges, so long as they bear a reasonable relation to the end sought to be achieved. Thus, for example, in United Public Workers of America (CIO) v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), the Supreme Court upheld the provisions of the Hatch Act which called for dismissal of Government employees engaging in political activity where the exercise of that right would substantially interfere with the proper performance of their duties. *Id.* at 97–101, 67 S.Ct. 556. As Mr. Justice Holmes stated: "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. City of New Bedford, 155 Mass. 216, 220, 29 N.E. 517 (1892).

21. Dean Wigmore, in his treatise on the law of evidence in support of statutes such as the one involved herein, states:

"In a period and a jurisdiction where corruption in various forms becomes rife, the principle of waiver may need to be systematically invoked for persons who are candidates for public office and for persons who propose to contract with the Government for goods or services. That bribery and other forms of corruption cannot usually be proved without the testimony of some accomplice, and that the present privilege must for that purpose be got rid of, is indicated by the widespread use of immunity-grants for testimony to such offences (post, § 2281). But is it necessary to pay that price for such testimony? Would the general administration of criminal justice suffer if the privilege were removed without releasing from penalty some of the offenders in that particular class of offences?

By requiring a waiver, as a condition precedent to eligibility for holding public office or for making a government contract, that result can be obtained. To admit the need for this expedient is perhaps humiliating to a community. But as a temporary medicine, it may be desirable; and it has been powerfully advocated * * * [quoting a speech by the Honorable Samuel Seabury before the American Law Institute on May 7, 1932]." 8 Wigmore, Evidence § 2275(a) (1940). This volume has since been revised by Professor McNaughton in 1961.

Moreover, in one sense relator owed a higher duty to freely discuss and answer questions relating to the performance of his official acts than a Government employee. In the case of a public employee, the state has at least a choice of hiring or not hiring an individual, whereas in the case of a contractor the state's ability to choose is severely restricted. In requesting the instant legislation, Governor Rockefeller stated:

"In a recent grand jury investigation, a number of persons who had transacted business with a governmental agency refused to answer questions about those transactions put to them by the grand jury. In its report, the grand jury recommended consideration of amendments to the law which would disqualify such persons from further transactions with public agencies.

Unlike a private person who may contract with whom he wishes, a public agency usually lets contracts by public auction and is required to accept the lowest bid. For that reason, it would seem appropriate to disqualify the bids of persons who are unwilling to disclose to a grand jury facts relating to some prior contract with the public. Likewise, it would seem appropriate that public contracts should provide that the benefits accruing under them be available only so long as the beneficiary is willing, when required by a grand jury, to disclose any information he may have as to a public contract."

In any event, since the disqualification provisions were never called into play, the state was never called upon to justify relator's disqualification on a ground (e. g., fitness, breach of trust, lack of candor, etc.) other than the exercise of his right. Accordingly, we are not really confronted with the stark situation of disqualification solely by reason of a refusal to waive self-incrimination rights. Thus the sanction of the statute can be upheld on the grounds heretofore applied in public employee cases. For a public contractor who refuses to divulge information about prior transactions with the state can very reasonably be said to have thereby impeded an investigation into his qualifications and fitness to continue doing business with the state, and thereby undertaken activity wholly inconsistent with his position of responsibility and trust.

As we have seen supra at 93–94, statutes similar to the one herein have been upheld in the past. If such a possible sanction was permissible before Malloy v. Hogan, *supra,* has that decision impaired the legitimate interest of the state to investigate unfettered, as it has done heretofore, the qualifications and fitness of its employees and to ensure the efficiency and honesty of its operations?

In answering that question I assume, based on the facts presented herein, that the investigation being conducted by the Grand Jury related to public contracts, that the area of inquiry was thus within the purview of the statute and that the questions posed to relator were in that area as well, covered prior transactions with the state and the answers to which would clearly reflect on relator's qualifications and fitness to contract with the state.

I see no reason for this Court to hold that Malloy v. Hogan has, in effect, wiped out the prior decisions of the Supreme Court which held comparable statutory enactments valid, though prior to the Malloy decision. The state's vital interest in its employees and persons doing business with it who occupy a position of trust is no less now than prior to Malloy, and the neccesity of probing into their qualifications and fitness is equally as important as prior to Malloy. Of prime importance, however, is the fact that what Malloy proscribes is not waiver of immunity statutes, but rather dismissal (a disqualification) predicated solely upon one's invocation of the Fifth Amendment privilege. Gardner v. Murphy, 46 Misc.2d 728, 260 N.Y.S.2d 739 (S.Ct.1965). Since justification for the sanctions incorporated in these statutes has been heretofore placed on grounds

other than invocation of one's privilege alone, it remains for a court higher than this one to now declare all of those prior cited authorities not to be controlling.

I am not unfamiliar with the dicta contained in United States ex rel. Stevens v. McCloskey, 345 F.2d 305 at pages 309 and 310 (2d Cir. May 11, 1965), certiorari granted 86 S.Ct. 53. However, as recognized therein, by way of a "But see" citation, this dicta is in conflict with Slochower v. Board of Higher Educ., *supra*; Garner v. Board of Public Works, *supra*, and United States ex rel. Carthan v. Sheriff, *supra*, and the cases cited therein. Moreover, I find the decision in Gardner v. Murphy, *supra*, in the absence of other authority in point, to be persuasive in upholding the validity of a similar waiver of immunity provision.

In Gardner, *supra*, the situation presented involved the summary dismissal of a policeman based solely on his refusal to sign a waiver of immunity, a procedure held by the Court to be violative of the petitioner's due process rights.

After observing that the " 'Constitution does not guarantee public employment' (Mr. Justice Frankfurter concurring in Garner v. Board of Public Works of Los Angeles, 341 U.S. 716, 724 [71 S.Ct. 909, 915, 95 L.Ed. 1317] * * *), and the government by its proper authorities may prescribe rational standards as prerequisites for public employment" (46 Misc.2d at 735, 747, 260 N.Y.S.2d at 747), Justice Markowitz upheld the constitutionality of the provisions therein under attack thusly: "A requirement, that each public employee must adhere to the standard prescribed for Caesar's wife and evince the candor of Cato, concerning his office, cannot be characterized as an unreasonable condition of employment. This is the duty imposed by Article 1, section 6 of the New York Constitution [supra] and section 1123 of the Charter of the City of New York [supra]." Ibid, 260 N.Y.S.2d at 748.

■ Similarly in the case at bar, relator possessed no inalienable right to contract with the state. His right in that regard could be tempered by reasonable conditions imposed upon him, one of them being the necessity of being candid with the authorities and giving full answers to questions propounded by investigative bodies, the answers to which would reflect on his qualifications and fitness to utilize the privilege of doing that business. Accordingly, it is not unreasonable for the state to expect that business done with it was aboveboard and that persons doing that business would be frank and assist in the investigation of their qualifications. To impede that investigation by any device is to preclude the state from judging those qualifications and breach the trust imposed on a "quasi" governmental official such as a public contractor.

Comment should also be made of the case of Callahan v. New Orleans Police Dep't, 171 So.2d 730 (La.Ct.App.1965). That case involved the constitutionality of Article XIV § 15(P) (1) of the Louisiana Constitution, discussed *supra*, in the light of the Malloy decision. The Court held therein that the requirement of dismissal for failure to waive immunity did indeed abridge the policeman's right to invoke the Fifth Amendment. The Court, however, further held that such abridgement was not without due process of law, which is what is proscribed, and, accordingly, upheld the constitutionality of the section.

After noting the balance that must be reached between due process of law and the police power of the state, the Court held:

"The paramount interest of the public in the area of law enforcement is so obvious that further comment seems unnecessary. A police officer who refuses to cooperate with the proper authority of the city by which he is employed; who refuses to give information within his knowledge; or who impedes or hinders the inquiry by the proper authorities into violations of the law which he has sworn to uphold and defend, is no longer of any value to

the city as a police officer. Any law which declares and renders such officer disqualified from continuation in public service is within the limits of the reasonable exercise of the police power of the State and not violative of due process. State v. Southwestern Electric Power Company, 127 So.2d 309 (La.App.2d Cir.1961), pp. 315–316.

Sergeant Callahan has no inalienable right to employment as a police officer; hence the paramount right of the people of the City of New Orleans to protection against law violation far transcends any right Callahan has to employment in a position, for which, by his actions, he has demonstrated his unfitness and disqualification." *Id.* at 737.

A similar police power argument can, of course, be made in the case at bar and can just as reasonably be applied to other Government employees and persons doing business with the state.

In addition, note must be made of the Supreme Court of New Jersey's decision in State v. Naglee, 44 N.J. 209, 207 A.2d 689 (1965), wherein the policemen therein involved waived immunity and the evidence adduced by reason thereof was used in a subsequent prosecution against them.

Prior to the statement being taken, the examiner advised them of their self-incrimination right and the possibility of waiver if testimony were given. He then stated:

*"This right or privilege that you have is limited to the extent that you as a police officer once sworn and asked questions pertaining to your office and your conduct therein, if you refuse to answer, you may then be subject to a proceeding to have you removed from the department." Id.* at 693.

The Court, in initially passing on the question of voluntariness of the waiver, stated:

"Therefore, an appellate court must examine the entire record to determine not merely whether coercive pressures were present, but whether under the totality of the circumstances they were of an offensive nature and were sufficient in degree to rendered the declarant incapable of freely exercising his will." *Id.* at 694.

In holding the waiver voluntary, the Court considered the following criteria:

"The record lacks all of the elements of coercive tactics which were present in prior cases holding confessions to be involuntary. Here there is no physical coercion, no overbearing tactics of psychological persuasion, no lengthy incommunicado detention, or efforts to humiliate or ridicule the defendants. The overt circumstances show that the interrogation was conducted with a high degree of civility and restraint. We are convinced that the State sustained its burden of proving that the degree of coercion exerted upon the defendants could not have been sufficient to overbear their wills."

The Court held that the statement above was not coercive in that a policeman by the nature of his position has a duty to cooperate in investigation of his duties and that failure to cooperate justifies dismissal even without a statute. Thus the Court recognized a policeman's right to exercise his privilege but noted also the co-equal possibility that he may be discharged for doing so. *Id.* at 696. (The rationale sometimes applied prior to Malloy.) "A subsequent discharge is not predicated upon an inference of guilt from the police officer's refusal to testify, but upon his failure to cooperate in a situation where his duty compels cooperation. See the discussion in Ratner, 'Consequences of Exercising the Privilege Against Self-Incrimination,' 24 U. Chi.L.Rev. 472, 503–4 (1957)." *Ibid.*

In a discussion particularly apposite to the questions presented herein, in that it uses the same rationale applied prior to Malloy, the Court stated:

"The defendants in their brief have made a point which we have not previously discussed. They con-

tend that a public official may not be subjected to a penalty (here the loss of employment) because of the exercise of a legal right (here the constitutional right to refuse to answer questions on the ground that the answers would be self-incriminatory). But there are situations where a public official's right to retain his position may properly depend upon a willingness to forego a constitutional right to the extent that the exercise of such a right may be inconsistent with the performance of the duties of his position. For example, a member of the judiciary of this State cannot engage in partisan political activity.

The question is not whether the State can require an employee to forego the exercise of the constitutional right. Of course it cannot. The question is whether the State's requirement that a given employee forego a given constitutional right as a condition of continued employment is *reasonable*. We need not now determine whether it would be reasonable for the State, under other circumstances, to dismiss employees holding other public positions because they refuse to answer questions on the ground of self-incrimination. See Ratner, supra, at pp. 504–511. We think it reasonable, however, for the State, in a proper proceeding, to dismiss a police officer for refusal to answer questions pertaining to his official position in an investigation such as the one conducted here." *Id.* at 697.

Accordingly, the constitutionality of Section 103-b will be upheld by this Court.

Before passing to the second ground upon which relator asserts the infirmity of the statute, mention must be made of a point not raised in the briefs, namely, the use of testimony, secured by reason of the waiver, at a subsequent trial for the substantive crime.

■ Relator has voluntarily waived his rights in that he signed a waiver of immunity with full realization of its implications and after conferring with counsel. Thus his waiver was factually voluntary. The statute pursuant to which the waiver was signed is not unconstitutional; thus the sanction therein set forth does not render the waiver involuntary, nor does putting him to the choice of waiver or possible disqualification constitute an abridgement of his rights without due process of law. Accordingly, any testimony given was adduced after a voluntary waiver of immunity (privilege) and can be used, just the same as testimony given after waiver of the privilege by failure of invocation can be used.[22]

Finally, relator asserts that it was improper to re-summon him before the Grand Jury after the garbage contract was awarded to another and that in this sense he was denied equal protection of the law.

■ The discussion set out at pages 89–91 of the instant opinion is equally relevant here. The purpose of Section 103-b is to ascertain from those who choose to do business with a public agency, whether their business is or has been in violation of criminal statutes. The Grand Jury investigation was in that area of inquiry.

■ The fact that relator signed the waiver only because he wanted the contract is a question of subjective state of mind, a calculated decision that he took after conferring with counsel. The fact that the contract was rendered to another ((not by reason of the sanctions in Section 103-b)—compare Regan v. People of State of New York, 349 U.S. 58, 65, 66, 75 S.Ct. 585, 99 L.Ed. 883 (Concurring opinion per Warren, C. J.))—does not automatically terminate the Grand Jury's interest in him nor does it auto-

22. See, e.g., People v. Castillo, 3 A.D.2d 963, 163 N.Y.S.2d 136 (3d Dep't 1957). See also State v. Naglee, supra; but see State v. Kimberlin, 246 La. 441, 165 So. 2d 279 (1964).

matically permit him to then revoke his voluntarily executed waiver. In this sense he is no different than any other witness who, after waiving a privilege, is not then afforded the opportunity to halt the proceedings by then asserting his privilege. The area of inquiry was the same as on the prior occasion before the same Grand Jury, and the subsequent questioning was contiguous in time to the appearance when he signed the waiver.

 The statute requiring the waiver as applied to the initial signing of the waiver clearly did not contravene the equal protection clause since the classification of persons transacting business with the state is not wholly irrelevant to the achievement of the state's objectives in enacting the statute. See McGowan v. State of Maryland, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). Therefore the state's legitimate concern (discussion supra at 93–95) with honesty and efficiency among those charged with official responsibilities provides an adequate foundation for the application of the statutory requirement of waiver of immunity upon them as a class as to transactions within the scope of their official duties, or as to prior transactions with the state. The state must have this power in order to function properly and efficiently and to protect its citizens, especially in an area where the state is bound to accept the lowest bid of a contractor absent special circumstances.

The argument that, after the contract was awarded, relator's equal protection rights were violated is also untenable.

I note the concurring opinion of Chief Justice Warren, in Regan v. People of State of New York, *supra,* wherein he stated that a "state immunity statute—like any other state statute—must be applied uniformly unless there is some reasonable ground for classification; otherwise, the Equal Protection Clause of the Fourteenth Amendment is violated. After a city employee suffers the primary sanction of the constitutional and char-

ter sections—namely, loss of his position—it may well be that the waiver cannot be used to send him to the penitentiary for bribery when the same sanction would not be imposed on other witnesses giving like testimony."

The case at bar, however, is distinguishable. In the instant proceeding relator was not disqualified, i. e., the statutory sanction was never imposed. He was not awarded the contract, not as a result of any action of the Grand Jury or by reason of the sanctions of the statute, but rather as a result of an unrelated administrative determination of the City of Utica Board of Contract and Supply. Thus, insofar as the equal protection argument goes, his position is not materially different from that of a bidder who voluntarily withdraws his bid, or of a public employee who voluntarily resigns from public office.

 The view stated by Chief Justice Warren, *supra,* appears to indicate that the continued use of the waiver after the public employee has left the public employ to compel the defendant to convict himself may violate the Equal Protection Clause of the Fourteenth Amendment. However, this would appear to imply that a waiver valid and voluntary in its inception could be rendered null and void by an act of the witness, or an act unrelated to the Grand Jury proceedings, though the *raison d'etre* of those proceedings is still present.[23] Thus, by resigning from his job, or either withdrawing his bid or having it rejected for some extraneous reason, the waivant could secure a right which an ordinary witness who signs a waiver or testifies freely without invocation of his privilege would not have, i. e., the right to revive his privilege after having waived it, and the power to refuse to incriminate himself after having waived his right so to do. (In the case at bar, relator never refused to answer or sought to revoke his waiver.) It is beyond dispute that a non-employee or non-public contractor testifying under a waiver of immunity can-

---

23. See discussion accompanying Note 13, supra.

not, when he feels that an answer may implicate him, discontinue his testimony on an assertion of his right not to incriminate himself, just the same as a witness, having voluntarily begun to testify, cannot "select any stopping place in the testimony." Rogers v. United States, 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1951). He cannot thus "cry halt because the inquiry has gone into greater depth than he had anticipated." (United States ex rel. Carthan v. Sheriff, *supra*, 330 F.2d at 102.) If that were permitted relator would be at a greater advantage than other witnesses.

Accordingly, relator, having voluntarily waived his right, cannot thereafter in the same inquiry, before the same body, at a point very close in time to the signing of the waiver, revoke it by reason of occurrences extraneous to the proceedings. Because relator was no longer interested in the Grand Jury does not mean that that body had ceased to be interested in him. His attack on Section 103b is thus rejected.

For all of the reasons hereinbefore set forth, the within writ is accordingly dismissed.

So ordered.