Frohman **HOLLAND**, Irving Holland, **Harvey Miller, Robert Saunders, Bert Gilbert**, on their own Behalf and on Behalf of all other Persons Similarly Situated, Plaintiffs,

v.

**Frank S. HOGAN**, District Attorney and **Samuel Yasgur**, Assistant District Attorney and Each and Every Assistant District Attorney of New York County, and **Samuel Adler**, Defendants.

**No. 67 Civ. 1223.**

United States District Court
S. D. New York.

June 27, 1967.

Weil, Gotshal & Manges, New York City, for plaintiffs, Ira M. Millstein, Marshall C. Berger, Donald J. Williamson, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs-intervenors Richmond Kotcher, Norton Kotcher, David Gimpel and Jack Sacks, Edward N. Costikyan, Thomas R. Farrell, New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for plaintiffs-intervenors Michael W. Cammarosano and Edward Brennan and all other officers and employees of the Borden Co., Kent V. Lukingbeal, New York City, of counsel.

Frank S. Hogan, Dist. Atty., of New York County, for defendants Frank S. Hogan, Samuel Yasgur, and others, H. Richard Uviller, Samuel Yasgur, Michael Stack, Asst. Dist. Attys., of counsel.

J. Lee Rankin, Corp. Counsel, City of New York, for defendant Samuel Adler, Morgan N. Lipton, Vincent Zichello, Asst. Corp. Counsel, of counsel.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, intervenor-defendant, pro se, Samuel A. Hirshowitz, First Asst. Atty. Gen., Brenda Soloff, Asst. Atty. Gen., Karla Moskowitz, Asst. Atty., of counsel.

## OPINION

Before MOORE, Circuit Judge, and RYAN and HERLANDS, District Judges.

HERLANDS, District Judge:

This two-pronged motion by plaintiffs seeking a temporary injunction and a summary judgment for a permanent injunction presents a threshold issue concerning the Court's assumption of jurisdiction and a basic substantive issue concerning the constitutionality of certain state statutes and of the conduct of the defendant county and municipal officers in applying those statutes. The initial question is whether, in the particular circumstances of this case, the Court should invoke the doctrine of abstention

and thus defer further proceedings or dismiss the complaint. The second question is whether the challenged provisions of three New York State statutes,[1] General Municipal Law § 103–b, Finance Law § 139–b and Public Authorities Law § 2602, are constitutional and whether the District Attorney of New York County and his assistants and the Director of Purchase of New York City, under color of enforcing these statutory provisions, have violated, are violating and are threatening to violate plaintiffs' constitutional right against self-incrimination.

For reasons expounded in this opinion, the Court has decided to abstain from assuming jurisdiction and not to pass on the merits of the substantive constitutional questions. However, in the process of deciding whether this is a proper case for the exercise of such discretion as it may justifiably employ in determining whether to abstain, the Court has considered the totality of relevant factors including certain aspects of the substantive questions to the extent that they impinge upon the problem of abstention. While the Court's range of focus for present limited purposes encompasses various features of the basic constitutional questions, the Court has

not deemed it necessary to adjudicate those questions.

## I.

To place the issues in proper context, it is necessary to make a comprehensive statement of the nature of the proceedings and the parties' factual and legal contentions.

By order to show cause signed by District Judge Bryan on March 30, 1967, plaintiffs brought on a motion for a temporary restraining order, a preliminary injunction, a summary judgment and the convening of a three-judge statutory court under title 28 U.S.C. §§ 2281, 2284 and the General Rules of the United States District Court for the Southern District of New York, Rule 25. Judge Bryan refused to grant a temporary restraining order when he signed the order to show cause and made it returnable on April 4, 1967.

On April 4 and 11, 1967, District Judge Herlands heard argument on the motion. In a memorandum decision filed on April 14, 1967, Judge Herlands held that the proceedings "raise a substantial question as to the constitutionality" of the three state statutes and "that plaintiffs' application for an interlocu-

---

1. The relevant portions of the statutes under attack are almost verbatim the same. General Municipal Law § 103–b reads:

"§ 103-b. Disqualification to contract with municipal corporations and fire districts

Any person who, when called before a grand jury to testify concerning any transaction or contract had with the state, any political subdivision thereof, a public authority, or with a public department, agency or official of the state or of any political subdivision thereof or of a public authority, refuses to sign a waiver of immunity against subsequent criminal prosecution or to answer any relevant question concerning such transaction or contract, and any firm, partnership or corporation of which he is a member, partner, director or officer shall be disqualified from thereafter selling to or submitting bids to or receiving awards from or entering into any contracts with any municipal corporation or fire district,

or with any public department, agency or official thereof, for goods, work or services, for a period of five years after such refusal or until a disqualification shall be removed pursuant to the provisions of section one hundred three–c of this article.

It shall be the duty of the officer conducting the investigation before the grand jury before which the refusal occurs to send notice of such refusal, together with the names of any firm, partnership or corporation of which the person so refusing is known to be a member, partner, officer or director, to the superintendent of public works of the state of New York and the appropriate departments, agencies and officials of the state, political subdivisions thereof or public authorities with whom the person so refusing and any firm, partnership or corporation of which he is a member, partner, director or officer, is known to have a contract."

858

tory and permanent injunction must be heard and determined by a district court of three judges. 28 U.S.C. §§ 2281, 2284." Plaintiffs' application for a temporary restraining order was denied "for the reason that the evidence does not support a specific finding that specified irreparable damage will result to these plaintiffs if a temporary restraining order is not granted. 28 U.S.C. § 2284 (3)."

This three-judge court, having been duly designated, held a hearing on May 4, 1967.

On March 30, 1967, when plaintiffs obtained the order to show cause, they filed a complaint against the defendants herein: Frank S. Hogan, District Attorney of New York County, "and each and every assistant district attorney of New York County," and Samuel Adler. The defendant Adler is Director of Purchase of the City of New York.

The action is brought under title 42 U.S.C. § 1983, which relevantly provides that every person who, "under color of any statute, * * * of any State * * *, subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The complaint alleges that the court has original jurisdiction by virtue of title 28 U.S.C. § 1343(3) and (4), which covers actions to "redress the deprivation, under color of any State law, statute, * * *, of any right, privilege or immunity secured by the Constitution of the United States" and to "secure equitable or other relief under any Act of Congress providing for the protection of civil rights."

Two claims are pleaded in the complaint. The first charges that defendants' actions and threatened actions "deprive under color of public office, each plaintiff of, and impair the exercise of, his right not to incriminate himself, which right is secured to him by the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 6 of the New York State Constitution." The second claim is that the three challenged New York State statutes "are unconstitutional under the Fifth and Fourteenth Amendments to the United States Constitution."

The five named plaintiffs are suing "on their own behalf and on behalf of all other persons similarly situated." The complaint contains the conventional allegations for a class action under Fed.R. Civ.P. 23.

The named plaintiffs are: Frohman Holland, Irving Holland, Robert Saunders, Bert Gilbert and Harvey Miller. The first three are respectively treasurer, vice-president and secretary of Holland Farms, Inc. and Hegeman Farms Corp.; Gilbert is president of Trinity Dairy Co., Inc.; and Miller is president of Queensboro Farm Products, Inc. The four above-named corporations are stated to be "engaged in the processing, sale and distribution of milk in the New York metropolitan area."

The class on whose behalf plaintiffs have brought this action is described in the complaint as consisting of "all persons who are officers or directors of any corporation, firm, partnership or other business entity which engages, or may engage in any transaction or has or may obtain a contract or award or has submitted or may submit a bid for milk or dairy goods, work or services with the State of New York, any municipal corporation or fire district therein, any public authority therein or any public department, agency or official thereof."

Subsequent to the filing of the complaint the following persons appeared in the action as members of the above class: Jack Sacks, secretary of Eastern Farms Products, Inc.; Richmond Kotcher and Norton Kotcher, respectively secretary and treasurer of Ferndale Farms, Inc.; David Gimpel, president of Gimpel Farms, Inc.; and Edward Brennan and Michael Cammarosano, officers of The Borden Company. The Attorney General

of the State of New York, by stipulation, intervened as a party defendant.

We now detail the occurrences precipitating this litigation and the ensuing events, as described in the moving and opposing affidavits.

The Third March 1967 Grand Jury of the County of New York commenced an investigation to determine whether such crimes as conspiracy to prevent competitive bidding on public contracts, extortion, coercion and bribery had been committed in relation to the processing and distribution of milk and milk products during the past two or three years. The district attorney avers that he "has amassed considerable information which shows that a number of milk processing corporations have agreed to submit rigged milk bids to various governmental agencies. * * * that these corporations have taken milk which has been returned from stores as too old for sale and then repackaged it and delivered it to various governmental agencies including hospitals. * * * that these corporations and certain labor officials have agreed to coerce, threaten and harass the competitors of these milk corporations. These corporations and labor officials have agreed to raise and to fix milk prices. They have threatened and intimidated other milk dealers who balked at their scheme. That pursuant to that investigation over sixty witnesses have been called to testify before the Grand Jury. As a matter of caution, because of the wide spread corruption, practically all witnesses have been asked to sign waivers of immunity before testifying."

In the course of this inquiry, the district attorney called before the grand jury twenty-three individuals who are officers or directors of sixteen different milk processing and distributing corporations that sell and deliver milk and milk products to various governmental agencies.

In an early phase of the investigation, when its scope was broader than public contracts or bids, two witnesses were asked to sign a general waiver of immunity. Upon their refusal to do so, no action was taken by the district attorney with respect to any contracts their companies may have had with the City or State of New York.

However, when the inquiry was narrowed to the subject of municipal and state contracts and possible crimes committed in connection with them, the witnesses, including plaintiffs, were requested by the district attorney to sign a waiver containing the following language: "That pursuant to Section 103b of the General Municipal Law I hereby waive immunity against any subsequent criminal prosecution for any crimes which my testimony before this Grand Jury may disclose." None of the witnesses signed the waiver.

The district attorney argues that the explicit language of the proffered waiver and the ample opportunity of each witness to consult his attorney—who accompanied him to the grand jury anteroom—both before and during his grand jury appearance with respect to the waiver alerted each witness to the fact that he was going to be interrogated about municipal and state milk contracts.

The plaintiffs claim that, assuming arguendo the constitutionality of General Municipal Law, § 103-b, the district attorney has applied the statute in an unconstitutional manner by failing to offer them a waiver of immunity limited to specific transactions and contracts with the city and state; and by threatening them that, if they refused to sign a waiver of immunity, they and the corporations of which they were officers or directors would be barred from doing any business with the City and State of New York for a period of five years.

The relevant portion of the minutes of the Third March 1967 Grand Jury made available to us for purposes of this case, pursuant to an appropriate state court order, discloses that each of the five named plaintiffs (who appeared before the grand jury on March 21, 1967), eight other officers and directors of milk companies (who appeared before the grand jury on the same day), two

other similar witnesses (who appeared before the grand jury on March 23, 1967), four other similar witnesses (who appeared before the grand jury on dates not indicated) were told by the district attorney that the grand jury was conducting an investigation to determine whether the crimes of conspiracy, coercion, extortion, bribery of a labor union representative, bribery of a public official and bid-rigging, among other crimes, have been committed in relation to the processing and distribution of milk in the New York City area during the past two or three years; and that, if the witness failed to sign a waiver of immunity pursuant to General Municipal Law § 103–b, he and any firm that he represents might be disqualified from doing business with the City and State of New York for a period of five years.

The grand jury minutes also disclose that, in the case of a similar witness who appeared before the grand jury some unspecified time after March 30, 1967 (the date when the action herein was commenced), he was told by the district attorney that the grand jury was investigating the crimes of conspiracy to rig bids on public contracts, extortion, bribery and other violations of the Penal Law relating to public contracts for the sale and purchase of milk products by the City of New York and other government agencies; and that the witness's testimony was desired in relation to that inquiry. In the case of two similar witnesses who appeared before the grand jury on April 13, 1967, they were told by the district attorney that their testimony was sought in connection with the grand jury's investigation into such crimes as conspiracy to prevent competitive bidding on public contracts, bribery, extortion, and other violations of the Penal Law in relation to public contracts that the company of which they were officers had with the City and State of New York.

Following the above-mentioned witnesses' refusal to sign waivers of immunity, the district attorney wrote a letter, dated March 27, 1967, to the Mayor of the City of New York, Honorable John V. Lindsay, reading:

"Re: *People v. John Doe, et al*

Dear Mayor Lindsay:

The Third March Grand Jury of this county is presently conducting an investigation to determine whether violations of the penal law have been committed in relation to the processing and distribution of milk and milk products in the New York City Metropolitan area during the past two or three years.

In the course of this investigation, this office has subpoenaed a number of milk dealers who have contracts with City agencies. Pursuant to Section 103-b of the General Municipal Law, the standard contract of these agencies requires that contractors doing business with the various City departments sign waivers of immunity before the Grand Jury when called to testify concerning their transactions with the City.

Under Section 103-b this office is required to advise you that the following witnesses have refused to sign, and testify under, waivers of immunity before the New York County Grand Jury:

* * * [Here follow the names of eighteen persons, their corporate positions in fifteen different milk companies, and the companies' addresses.]

A duplicate original of this letter is being sent to Honorable Richard Lewisohn, Commissioner, New York City Department of Purchase, Municipal Building, Room 1924, New York, New York."

Thereafter, by letter dated April 21, 1967, the district attorney advised the municipal Commissioner of Purchase that three additional persons, the officers of two named milk companies, had "refused to sign waivers of immunity pursuant to Section 103–b of the General Municipal Law."

Having subpoenaed the above-indicated total of twenty-one persons representing seventeen different milk companies,

the district attorney now moves to dismiss the complaint against him for the asserted reasons, inter alia, that the grand jury investigation "insofar as section 103–b of the General Municipal Law is applicable" has been completed; that no additional witnesses are scheduled to be subpoenaed and asked to sign waivers of immunity pursuant to that statute; that he has completed sending notices to other governmental agencies under that statute; that he will do nothing further with respect to this matter; and that the complaint now is moot as to him.

On March 29, 1967, defendant Adler, upon examining the bids for the monthly contracts to supply milk and cream to various municipal institutions during the month of April, ascertained that two of the companies named in the district attorney's letters—Queensboro Farm Products Inc. and Weissglass Gold Seal Dairy Corp.—were low bidders on three items. The low bids of these two companies were disregarded; and, on March 30, 1967, contracts for the month of April for these milk products were awarded to the next lowest bidder, Sealtest, Inc.

It is to be noted that, although their low bids on the April contract were disregarded, Queensboro Farm Products Inc. and Weissglass Gold Seal Dairy Corp. were not expressly declared by the Department of Purchase to be disqualified from doing business with the City of New York. In fact, as will shortly be shown, they were invited by the City to submit bids on the May, 1967 milk contracts.

A brief reference to certain features of the Department of Purchase procedure in awarding milk contracts will impart added significance to the facts of this case.

The Department of Purchase awards contracts for the supplying of milk and milk products to hospitals, correctional institutions, park facilities, children's centers, men's shelters, and youth houses operated by the various agencies and departments of the City of New York. These contracts are awarded on a month-to-month basis. The City of New York has no milk contracts which by their terms are to be performed for any period longer than a month.

Bids for these contracts must be publicly advertised in the *City Record*. In addition, the actual bid forms for purchases are mailed to prospective bidders whose names have been placed on the department's official bidders' list. The method by which names are placed on the bidders' list is prescribed by Intradepartmental Procedure Governing the Department's Relationship with Bidders, section X which provides that the firm seeking to be listed must, inter alia,

"Execute an 'Application for Registration as a Responsible and Eligible Bidder'. This form includes business references and a financial statement.
\* \* \*
Should the data submitted by the applicant provide reasonable grounds for assuming his responsibility, his name will be placed upon the bidders' list. Should independent investigation show that the applicant is not responsible, his name will not be listed."

Bidders' lists contain the firm names and a code number for each firm. Addressograph plates, containing the bidders' code numbers, are used to prepare the envelopes for mailing the bid forms in connection with each particular bid opening. Using the foregoing code number list and addressograph plates for purposes of the May, 1967 milk contracts, the Department of Purchase mailed bid forms to each of the milk companies on the same bidders' list that has been used every month since July 25, 1966. This list included all of the companies whose names had been mentioned by the district attorney in his letters to the Department of Purchase. Evidently, the Department of Purchase continued to invite bids from each of these companies despite the refusal of certain of their officers and directors to sign a waiver of immunity in the course of the grand jury investigation. Incidentally, the milk licenses of these corporations issued by the

State Department of Agriculture and the New York City Department of Health have not been suspended or revoked.

Although all were thus invited to submit bids for a May, 1967 milk contract, one (Weissglass Dairies, Inc.) out of the seventeen milk companies listed by the district attorney submitted a bid for such a May, 1967 contract. Borden Farms Products Co., another company listed by the district attorney, submitted a bid for a cheese contract for the month of May, 1967.

The Department of Purchase records indicate that only three (Queensboro Farms, Borden Farms, and Weissglass Dairy) of those seventeen milk companies have submitted bids on municipal milk contracts at any time since October, 1966.

After it was ascertained that Weissglass Dairies, Inc. and Borden Farms Products Co. were low bidders on certain May, 1967 milk products contracts, they were given the opportunity to appear for a hearing before an administrative Board of Responsibility. The broader significance of a Board of Responsibility hearing will be discussed later in this opinion, but, at this point, the fact is noted that Weissglass Dairies, Inc. appeared before the Board of Responsibility and answered all questions. The hearing as to it has not yet been closed. Borden Farms Products Co., however, refused to appear at a Board of Responsibility hearing.

Unlike the municipal milk contracts that are awarded on a month-to-month basis, the milk contracts of the Board of Education of the City of New York are for a one-year period. Three of the milk companies listed by the district attorney have contracts with the Board of Education. Those contracts have not been cancelled despite the fact that their officers refused to sign a waiver of immunity.

We now refer to certain undisputed facts relating to plaintiffs personally as distinguished from the corporations of which they are officers and directors.

At no time material to these proceedings were any of the plaintiffs licensed to engage in the milk business; none of them personally conducted such business; none of them had any milk contract with the City or State of New York.

The facts just recited have engendered the issue whether plaintiffs, in their personal capacity, have standing to maintain this action. Defendants argue that plaintiffs cannot equate themselves, as individuals, with the corporations with which they are associated; that, inasmuch as plaintiffs are not licensed to engage in the milk business, they cannot and do not have any relationships with the City as bidders or contractors; that neither the challenged statutes nor the criticized district attorney's letters to governmental purchasing agencies nor the actions of such purchasing agencies can operate as against any of the plaintiffs personally; that this action by plaintiffs "is a transparent subterfuge" by "nominal plaintiffs who have no contracts with the City" really coming to the rescue of corporations, the "real parties in interest," who "have no privilege against self-incrimination and are not in a position to claim that anyone has violated their privilege"; and that, therefore, plaintiffs do not have standing to challenge the constitutionality of the statutes or defendants' acts.

On the other hand, plaintiffs claim that, by operation of the self-executing provisions of the statutes, each of them has been personally disqualified from doing any business whatsoever with the City or State for five years; that, because plaintiffs are officers, directors and stockholders, and their personal rights of employment and property are so closely interrelated with their respective corporation's fate, the disqualification of the corporation from doing any business with the City and State for five years should be viewed as a direct and substantial invasion of their own personal rights flowing from their having invoked their personal constitutional privilege; and that, therefore, plaintiffs have standing to maintain this action.

Plaintiffs' argument premised on a coalescence of personal and corporate rights and injuries is illustrated by the following amorphous definitions by plaintiffs of the class on whose behalf this action is brought: "any milk company dealer which sells milk to the City of New York whose officers and directors could be called to testify" [Transcript of argument, May 4, 1967, p. 66]; and "anybody in the milk business who could possibly bid on a city or state contract * * * even if they are not on a Section 103–b notice * * * and even if they haven't been called" as witnesses [id. at 66–67]. A similar blending of the individuals and the corporations is evidenced by plaintiffs' request for an order which "includes a directive that the defendants and others be precluded from refusing to honor bids submitted by any member of the class on behalf of whom this action has been commenced, such class including officers of the fifteen companies which have been blacklisted and disqualified from public bidding." [Moving affidavit of Donald J. Williamson, sworn to April 7, 1967, p. 12.]

We have already alluded to the facts, that the City has continued to invite monthly milk contract bids from the companies listed by the district attorney; that the Board of Education has not cancelled its one-year contracts with the companies likewise listed by the district attorney; and that none of the listed companies has been declared in so many words by any governmental agency to be disqualified from doing business with the City or State.

In addition to the foregoing facts that may be taken as reflecting current governmental attitude and policy toward the listed companies, defendants emphasize that specific efforts are being made to set up administrative procedures that will, hopefully, obviate plaintiffs' constitutional objections and satisfy the criteria suggested by recent Supreme Court decisions. We shall now describe the steps being taken by the City toward that goal.

After the low bids by two companies for April, 1967 milk contracts had been disregarded by the Department of Purchase on or about March 30, 1967 because their names were on the district attorney's list, the Commissioner of Purchase apparently reviewed the situation, rethought the procedure, and decided "that he was not to disqualify bidders simply because they refused to sign the waiver of immunity under 103(b), that they were to be accorded a hearing first." [Transcript of Argument, May 4, 1967, p. 110.] What was done was to utilize the standing Board of Responsibility procedure with respect to the companies whose names had been listed by the district attorney when their officers or directors refused to sign a waiver of immunity. These measures are exemplified by the procedure set up by Commissioner of Purchase Lewisohn; and a superseding procedure prescribed by Commissioner Lewisohn's successor, Acting Commissioner Gersten.

The following is Commissioner Lewisohn's description of his procedure:

"4. I have directed Samuel Adler [Director of Purchase] that, in the event any of the persons or corporations listed in the notice of refusal heretofore received from the District Attorney, or in any future notices of refusal, are low bidders on any city contracts, before any such persons or corporations be disqualified pursuant to § 103–b of the General Municipal Law, such persons be given an opportunity to explain such refusal to sign a waiver of immunity, before the Board of Responsibility.

5. I shall request a meeting of the Board of Responsibility in accordance with Board of Estimate resolution adopted on June 30, 1949 (Cal.No. 318–A), § 5(c) which reads in part as follows:

'§ 5(c) A bidder shall be declared disqualified because not responsible only upon the determination of a Board to consist of the Comptroller, the Corporation Counsel and the head of the agency making the

award, or their authorized representatives. Such Board shall meet upon the call of the head of the agency making the award. The Board shall investigate and pass upon the responsibility of the bidder. The records and facilities of all agencies shall be available for the use of the Board. The findings of the Board shall be filed by the head of the agency making the award with the Comptroller and the Treasurer.'

6. Following such a hearing, the Board of Responsibility will make its determination as to the qualification of such persons or corporations to receive awards of City contracts in accordance with § 103–b of the General Municipal Law." [Opposing affidavit of Richard Lewisohn, sworn to April 7, 1967.]

Commissioner Lewisohn having resigned on April 3, 1967 and Marvin Gersten having become Acting Commissioner of Purchase, Commissioner Gersten expressly superseded the procedures established by his predecessor and issued instead the following instructions to the Director of Purchase:

"(a) None of the persons or corporations listed in the notices of refusal heretofore received, nor any person or corporation listed in any future notice of refusal, is to be disqualified from receiving city contracts for five years automatically upon receipt of such notice of refusal, nor shall such person or corporation be denied the award of any city contract solely by reason of the fact that his or its name appears in a notice of refusal.

(b) Such persons or corporations listed in a notice of refusal shall be accorded a hearing at which an opportunity will be given to explain the refusal to waive immunity or to answer a question before the grand jury, investigating public contracts.

(c) Such hearings will not be held pending the determination by this court of the issues involved in the instant litigation.

(d) In the event such persons or corporations listed in a notice of refusal shall be a low bidder on a city contract, a meeting of the Board of Responsibility shall be convened in accordance with § 5(c) of the Resolution of the Board of Estimate adopted on June 30, 1949 (Cal.No. 318–A) which provides as follows:

\* \* \* [Here follows the text of § 5(c), as previously quoted in the Lewisohn affidavit, supra.]

\* \* \*." [Opposing affidavit of Marvin Gersten, sworn to May 1, 1967.]

The major distinction between the Lewisohn and Gersten procedures may be described as follows: Under the former procedure, when a person or corporation listed in a notice of refusal to waive immunity is a low bidder on any city contract, the person refusing to waive is given an opportunity to explain that refusal to the Board of Responsibility; and the Board determines whether such person or corporation is qualified to receive awards of City contracts "in accordance with § 103–b of the General Municipal Law." Under the latter procedure, a person or corporation listed in any notice of refusal to waive immunity or to testify is not to be disqualified from receiving city contracts nor to be denied the award of any city contract solely because his or its name appears in a notice of refusal; but such person or corporation is to be accorded a hearing before the Board of Responsibility at which an opportunity is to be given to explain the refusal to waive immunity or to testify before the grand jury. Presumably the Board then determines whether such person or corporation is a responsible bidder. Defendants state that hearings under the Gersten procedure with respect to corporations listed by the district attorney will not be held until this court decides the present case.

However, some light on how the procedure actually works out is shed by the hearings conducted by the Board of Responsibility on April 28, 1967 in the matter of the bid of Dairymen's League

Cooperative Association, Inc. (hereinafter Dairymen's League).

Dairymen's League submitted a bid on April 21, 1967 for the May contract to supply milk and cream to certain municipal institutions. A rider attached to the bid stated that certain employees of the company had refused to sign waivers of immunity before the grand jury. The Board of Responsibility was convened to pass upon the responsibility of Dairymen's League as the low bidder on the particular May contract.

At the hearing, the transcript of which runs to 76 pages, Dairymen's League was represented by counsel. Upon counsel's advice, the witness (who was metropolitan district manager but not an officer or director of the company) declined to answer such questions as whether the witness had discussed milk prices with any other milk dealers; whether he had discussed customer allocation with other milk dealers or with labor union officials; whether he had met with certain named competitors and named labor union officials; whether bids submitted by the witness had been arrived at independently, without collusion or consultation with competitors; whether bids submitted by the witness in 1966 had been disclosed to other milk companies prior to their submission to the City.

Counsel for Dairymen's League, in explaining why he had instructed the witness to refuse to answer these questions, took the position that these questions did not bear upon the issue of the responsibility of Dairymen's League as a bidder; and that the questions invaded the constitutional rights of the witness and the corporation. The City's contrary view was that answers to the questions were relevant to the moral worth and integrity of the corporation, a factor materially related to its responsibility as a bidder and having nothing to do with the Fifth Amendment or General Municipal Law § 103–b; and that the circumstances—that an employee of the company had declined to sign a waiver of immunity before the grand jury and to answer questions before the Board of Responsibility and that the company had failed to produce before the Board of Responsibility anyone with personal knowledge of the facts to admit or deny it had acted collusively—raised legitimate doubts concerning the company's responsibility which the City was entitled to have resolved by pertinent evidence from the company in determining whether the contract should be awarded to the company.

On April 28, 1967, the Board of Responsibility setting forth its findings in a six-page decision, declared that the Dairymen's League was not a responsible bidder and disqualified it for the May, 1967 contract. This determination was sustained by the New York State Supreme Court on June 13, 1967. In re Dairymen's League Cooperative Ass'n. Inc., v. Perrini (N.Y.County Sup.Ct., Sp.T., Part I), 282 N.Y.S.2d 887.

In the proceedings before us, plaintiffs dispute the validity of the fundamental concept implicit in the technique of a Board of Responsibility hearing when it is employed in a situation where a corporation's officer, director or employee has invoked his personal Fifth Amendment privilege or where the corporation has failed to produce representatives who are willing to answer the City's relevant questions about the corporation's qualifications as a bidder. The gist of plaintiffs' argument is that the corporation's officer, director or employee may not be called upon to explain to the City why he has claimed his Fifth Amendment privilege or refused to waive it before the grand jury; that his assertion of that privilege cannot be visited with sanctions against him or his company; and that, in the absence of some affirmative independent proof of wrongdoing adduced by the City, the refusal of the questioned bidder to supply information about itself and its activities—which refusal is manifested by the invocation by the corporation's officer, director or employee of his Fifth Amendment privilege—cannot serve as the predicate either for

disqualifying the company and the particular officer, director or employee or for rejecting the company's low bid for a specific contract.

Defendants do not rely exclusively upon the procedure of a Board of Responsibility hearing as the means to avert or defeat plaintiffs' attack in this Court upon General Municipal Law § 103–b. Defendants' other claims, in summary form, are:

(1) Section 103–b is constitutional. It represents a reasonable means to implement state and municipal policy for the protection of the public by enabling the state and local governments to insure themselves of responsible bidders. Recent Supreme Court decisions interpreting the Fifth Amendment privilege have involved materially different factual situations and legal issues.

(2) General Municipal Law § 103–c —providing for a special proceeding in the State Supreme Court whereby the court may, in the public interest, discontinue the disqualification under § 103–b—is a State remedy available to persons such as plaintiffs herein and their corporations and should be resorted to before commencing a federal action.

(3) The constitutionality of Section 103–b may soon be adjudicated by the New York State Court of Appeals in a case that was submitted to it on May 15, 1967 and now *sub judice,* Matter of George Campbell Painting Corp. v. Reid, infra.

(4) The constitutionality of New York City Charter § 1123—providing for the dismissal of a municipal employee who refuses to sign a waiver of immunity or to testify in an inquiry into his official conduct—as applied in conjunction with a departmental hearing procedure that affords the employee an opportunity to explain his stand, may soon be adjudicated by the New York State Court of Appeals in a case that was argued before it on May 15, 1967

and now *sub judice,* Matter of Gardner v. Murphy, infra.

(5) New York CPLR Article 78 enables plaintiffs to institute a special proceeding in the New York State Supreme Court whereby they can expeditiously test the constitutionality of the challenged statutes.

Plaintiffs' position with respect to all of the foregoing contentions is that Section 103–b is unconstitutional on its face and also as applied; that none of the hearing procedures suggested by defendants can cure Section 103–b of its fatal constitutional infirmity of imposing a burden or consequences upon a person for having invoked his constitutional privilege; that plaintiffs are being exposed to immediate, direct and irreparable injuries for which there is no adequate State remedy; and that this Court should assume jurisdiction and grant the prayed for relief.

## II.

The reasons more fully articulated in the course of this opinion have convinced us that the uncertain and shifting factual and legal background of the present action requires us to abstain from passing judgment on the merits of plaintiffs' motions. While our decision is posited squarely on the doctrine of abstention, we point out that salient questions pertinent to the standing of the plaintiffs, the finality of the challenged government action, and the ripeness of the controversy are inextricably interrelated with the structural elements shaping our determination. Cf. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 150–157, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (concurring opinion of Frankfurter, J.).

The Supreme Court first expressed its conception of the doctrine of abstention as a restraint of judicial authority grounded in the sound discretion of an equity court in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971

(1941).[2] Under the rationale there expounded, federal court abstention is permissible—indeed sometimes required[3] —when a substantial federal constitutional issue might be avoided by a definitive ruling upon an unsettled preliminary question of state law, provided that ample means exist whereby such a ruling may be obtained in the state courts.

Woven into the fabric of the policies implicit in this criterion was an expressed desire to avoid the "needless friction" which a "premature constitutional adjudication" would work upon federal-state relations. Moreover, the Supreme Court paused to note that the constitutional issue there raised—involving a claim of racial discrimination —"touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." 312 U.S. at 498, 61 S.Ct. at 644.[4]

■ Although the Supreme Court has repeatedly recognized that the question of abstention must be answered on a case-by-case basis,[5] recent decisions seem to have modified the applicable criteria, tending, in general, to narrow

the scope of the doctrine. While it occasionally had been suggested that federal courts ought, as a matter of comity, to defer to state tribunals whenever the validity of state action is drawn in question under the federal constitution, it is now quite clear that a federal court may properly abstain only when the underlying state law is uncertain. Harman v. Forssenius, 380 U.S. 528, 534–36 (1965), 85 S.Ct. 1177, 14 L.Ed.2d 50; Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L. Ed.2d 1163 (1959).[6] Moreover, that uncertainty must be material to the constitutional question. Where the doubt or ambiguity could not affect the constitutional adjudication, or where no possible interpretation could save the state law, abstention would not be appropriate. Harman v. Forssenius, supra; McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

■ On the other hand, the criterion pertaining to the possible disposition of the federal constitutional issue has been somewhat broadened. While Pullman

2. There are other classes of abstention cases apart from the Pullman-type. See Wright, Federal Courts, § 52 at pp. 172–77 (1963); Note, Abstention from the Exercise of Federal Jurisdiction, 59 Colum.L.Rev. 749, 757–66 (1959); see generally Barron & Holtzoff, Federal Practice and Procedure § 64 (Wright Ed. 1960).

3. See, e.g., Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959); Harrison v. N.A.A.C.P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959).

4. Interestingly, it is now believed that in cases involving an alleged deprivation of constitutional rights based on racial grounds, the federal courts should be most reluctant to abstain. Cf. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). It has been suggested that there is a strong national interest in providing a federal forum for such claims, perhaps based in part on a fear of state court nullification, prejudice or delay. See American Law Institute Study of the Division of Juris-

diction Between State and Federal Courts, proposed 28 U.S.C. § 1371(g) and Commentary pp. 172–73 (Tent. Draft No. 5 1967); Note, Federal Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L.Rev. 604, 607–11 (1967); Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 230 (1948).

5. See, e.g., Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

6. The requirement of uncertainty of state law is perhaps less rigorously applied where the plaintiff is seeking to enjoin a potential or actual state criminal prosecution. These cases involve considerations which go beyond those which are pertinent in a case of the Pullman variety. See, e.g., Fenster v. Leary, 264 F. Supp. 153 (D.C.1967), aff'd per curiam, 386 U.S. 10, 87 S.Ct. 862, 17 L.Ed.2d 701 (1967); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

itself presented the possibility of avoiding altogether the constitutional question, the subsequent course of decisions indicates that abstention may be justified if the question might be "presented in a different posture" by the determination of state law, County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 189, 79 S.Ct. 1060 (1959), or if the state law adjudication might "materially change the nature of the problem." Harrison v. N.A.A.C.P., 360 U.S. 167, 177, 79 S.Ct. 1025, 1030 (1959).

As phrased most recently in Harman v. Forssenius, supra, the test is whether "resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law". 380 U.S. at 534, 85 S.Ct. at 1182.

Postponing the exercise of jurisdiction would seem to be least acceptable in suits involving an alleged abridgement of First Amendment rights or of voting rights. When state law is attacked on its face on vagueness grounds under the First Amendment, the overriding concern has been the "transcendent value to all society" of free expression. Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). But cf. Zwickler v. Koota, 261 F.Supp. 985 (E.D.N.Y.1966), prob. jurisd. noted, 386 U.S. 906, 87 S.Ct. 854, 17 L.Ed.2d 781 (1967).

Likewise, in cases affecting voting rights, the societal interest in having an immediate adjudication of a claimed impairment of the democratic process has overshadowed other policies. Harman v. Forssenius, 380 U.S. 528, 537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964).

■ The posture of the plaintiff or plaintiffs in relation to the challenged state action represents another factor to be evaluated. For example, when contemplated state action may have varying effects upon different plaintiffs, the Supreme Court has reversed a district court for failing to abstain. Martin v. Creasy, 360 U.S. 219, 224–25, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959). By contrast, a declination to abstain was approved when the ruling on the federal constitutional issue would not disrupt an entire regulatory scheme, but merely determine the constitutionality of its application solely to a particular, narrow factual situation. Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 328–29, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964).

■ Abstention is not favored when there is evidence of bad faith in the enforcement of questionable state law, Dombrowski v. Pfister, 380 U.S. 479, 489–90, 85 S.Ct. 1116 (1965), or when there has been seemingly interminable delay in state proceedings, Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), or federal proceedings. Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293 (1964).

■ Finally, the nature and extent of the alleged injury and the availability and relative effectiveness of any state court remedy remain weighty factors in determining the propriety of abstention. Compare Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034 (1959), with McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433 (1963).

Analyzing the record before us in light of the criteria and guidelines just discussed, we view this as a classic case for invoking the doctrine of abstention.

Beyond question, recent innovative developments under the Fifth and Fourteenth Amendments have engendered difficult and substantial questions about the constitutionality of Section 103–b of the New York General Municipal Law and, at least by analogy, the cognate provisions of the Public Authorities Law and the State Finance Law. Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 636, 17 L.Ed.2d 574 (1967); Garrity v. State of New Jersey, 385 U.S. 493,

87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956). But see United States ex rel. Laino v. Warden of Wallkill Prison, 246 F.Supp. 72, 92–100 (S.D.N.Y.1965), aff'd per curiam, 355 F.2d 208 (2d Cir. 1966).[7]

These issues cannot be resolved by resort to the facile but question-begging generalizations that the award of a public contract is a privilege rather than a right or that the state is acting in its proprietary, rather than its sovereign, capacity. Cf. Thorpe v. Housing Authority, 87 S.Ct. 1244, 18 L.Ed.2d 394 (April 17, 1967). Broadly worded principles as expressed in recent constitutional decisions in the area of self-incrimination and due process may arguably be interpreted as competing here with the important governmental policies that led to the enactment of the remedial legislation now sought to be invalidated by the plaintiffs on constitutional grounds. The demonstrated need to protect the public fisc against theft through collusive bidding on public contracts and the manifest desirability of awarding public contracts only to those possessing certain minimal qualifications of moral worth and responsibility constitute highly significant state interests that are the raison d' être of the challenged stat-

utes. Similarly, it would be difficult to gainsay the reasonableness of the state's effort to impose legislatively upon those with whom it does business a continuing duty of candor and disclosure concerning their transactions with the state.[8]

We recognize that the existence of significant underlying state policies, by itself, cannot serve to validate the means chosen to effectuate those policies. Like all forms of state action, this legislation must comport with applicable constitutional criteria. But before this Court could reach the constitutional issues which have been raised here, we would have to know how the statutes in question are to be construed.

While Section 103–b, on its face, appears to be self-executing, we cannot agree that it is not fairly subject to various other interpretations. A closely similar statute applicable to public employees has been interpreted by lower state courts to require a hearing. Matter of Gardner v. Murphy, 46 Misc.2d 728, 260 N.Y.S.2d 739 (Sup.Ct.N.Y.Cty. 1965), aff'd without opinion, App.Div., 1st Dep't, 279 N.Y.S.2d 150; Matter of Koutnik v. Murphy, 25 A.D.2d 197, 268 N.Y.S.2d 265 (1st Dep't 1966); Matter of Conlon v. Murphy, 24 A.D.2d 737, 263 N.Y.S.2d 360 (1st Dep't 1965). See also New York State Temporary Commission on the Constitutional Con-

7. While not intimating any opinion as to the merits of the basic constitutional questions raised herein, we should note that despite broadly worded statements in the majority opinion in Garrity v. State of New Jersey, supra, and the plurality opinion in Spevack v. Klein, supra, at least a majority of the Supreme Court seem to entertain the view that a public employee may be dismissed for his failure to answer questions narrowly addressed to his performance of public duties. This question, however, was not actually decided in either of the cited cases. Also remaining unresolved under a specific reservation in *Spevack* is the question of the constitutionality of a license revocation based on a failure to produce records required to be kept under state law to facilitate reasonable supervision of state licensees.

In terms of abstract analysis, the public contractor may fall somewhere between the state licensee (such as the attorney in *Spevack*), whose license cannot be revoked for refusing to testify, and the public employee, who possibly may be discharged for remaining silent as to certain matters. Analysis also suggests that there may be material factors that realistically distinguish the public contractor from both the state licensee and the public employee.

8. That a number of jurisdictions have enacted laws similar to the New York legislation bears testimony to the importance of the governmental interests involved. See United States ex rel. Laino v. Warden of Wallkill Prison, 246 F. Supp. 72, 92 (D.C.1965); Wigmore, Evidence § 2272 n. 18 (McNaughton Ed. 1961).

vention, Individual Liberties, the Administration of Criminal Justice, pp. 200–210 (1967). The *Gardner* case is presently *sub judice* in the New York Court of Appeals. Also *sub judice* there are two companion cases involving the termination of a public contract—based on a refusal to waive immunity—under Section 2602 of the Public Authorities Law. Matter of George Campbell Painting Corp. v. Reid, Sup.Ct., 48 Misc.2d 544, 265 N.Y.S.2d 304, aff'd without opinion, App.Div., 1st Dep't, 275 N.Y.S.2d 363; George Campbell Painting Corp. v. Reid, No. 247/1966, Sup.Ct., N.Y.Cty., March 21, 1966, modified, App.Div., 1st Dep't, Nov. 4, 1966, 275 N.Y.S.2d 365. While constitutional objections virtually identical to those raised here have been argued in *Campbell*, there is, of course, no way of knowing whether the Court of Appeals will reach those issues.[9]

In the present case, between the filing of the order convening the three-judge court and the hearing of these motions,[10] the Acting Commissioner of Purchase of the City of New York issued instructions to defendant Samuel Adler, Director of Purchase of the City of New York, concerning the procedures to be followed in regard to persons and corporations listed in notices of refusal to waive immunity or to testify sent by defendant Frank S. Hogan, District Attorney for New York County. Those instructions provide that any person or corporation named in a notice shall be afforded an opportunity, at a hearing, to explain the refusal to waive immunity or testify. Interim procedures also were instituted pending a determination by this Court.

■■ At this juncture, we can only speculate as to the final form of the proposed hearing procedure. We are precluded from giving an advisory opinion as to the constitutionality of any particular procedure which might be adopted. All that can and should be said by us at this time is that state law seems far from "certain"; and we see no basis for a blanket ruling that no procedure which reasonably might be adopted could satisfy present constitutional doctrine.[11]

---

9. There is a preliminary question in *Campbell* whether the statute was properly invoked against the corporation, in light of the fact that the individual who refused to waive immunity stepped down from his position as an officer to a position as an employee before receiving the grand jury subpoena.

10. Cf. Thorpe v. Housing Authority, 87 S.Ct. 1244, 18 L.Ed.2d 394 (April 17, 1967) (change in applicable administrative procedure after writ of certiorari granted). But cf. Keyishian v. Board of Regents, 385 U.S. 589, 596, 86 S.Ct. 1921, 16 L.Ed.2d 1012 (1967) (change in procedure did not affect constitutional claim).

11. The fashioning of new administrative hearing procedures by the municipal Department of Purchase and the availability of other remedies under existing State law are not formalistic matters, like medievalisms, of merely saying the "right words * * * without slip or trip." Maitland, Old English Law, reprinted in The Maitland Reader (1957) 88.

Whatever the ultimate shape of such hearing and remedial procedures, they pose the challenging question whether a constitutionally valid distinction can be found between, on the one hand, a personal privilege of silence and, on the other hand, a possible duty of disclosure toward the state sought to be imposed upon a contractor when he enters into a public contract. A question of such importance should not be determined on the basis of an unfinished record.

Whether the sweeping generalization—that no adverse consequence whatsoever can be attached to the invocation of the Fifth Amendment privilege—is an untouchable premise without boundaries is a proposition that presents problems of delineation when sought to be applied to concrete situations. Broadly worded constitutional pronouncements are obvious hazards to those who, in dealing with hard specifics, must locate the line where the rhetoric of exposition merges into the reality of decision.

Moreover, while the present plaintiffs—individuals called to testify before the grand jury—have stressed the pure self-incrimination aspects of the constitutional problem, there also may well be pertinent procedural and substantive due process issues. These issues cannot be dealt with squarely until the precise nature of the state's administrative process is known.

This is a period of rapid constitutional evolution. There is bound to be an occasional gap between, on the one hand, the criteria established by the most recent Supreme Court decisions, and, on the other hand, existing interpretation of state constitutions, statutes and administrative regulations. Unless its power is used with a sensitive awareness of this inevitable problem, a federal court, by premature intervention, may stifle a state's efforts to interpret its laws so as to bring itself into compliance with newly promulgated constitutional guidelines. Common sense strongly suggests that the state courts be afforded a fair opportunity to pass on the constitutional objections to state law which have been generated by a dynamic constitutionalism. Cf. Government and Civic Employees Organizing Committee v. Windsor, 353 U.S. 364, 366–67, 77 S.Ct. 838, 1 L.Ed.2d 894 (1957).

In such circumstances, the logic of the doctrine of abstention is most persuasive. Today, as in the past, the states and their municipalities can serve as laboratories in which to develop methods of public administration that will effectuate state policies within the framework of evolving constitutional principles. A federal court should not prematurely abort this process of accommodation unless urgent countervailing considerations are present.

We face no such considerations here. The facts and circumstances surrounding the grand jury appearances do not constitute injuries of a kind requiring us to intervene before state action comes to rest. Cf. Fenster v. Leary, 264 F. Supp. 153 (S.D.N.Y.1966), aff'd per curiam, 386 U.S. 10, 87 S.Ct. 862, 17 L.Ed.2d 1324 (1967). Moreover, ample, effective and speedy procedures are available in the state courts to challenge a disqualification from bidding—or other administrative action—before irreparable injury occurs. When, as, and if the state proceeds to take some action predicated on the facts alleged herein, those affected may seek review of such action in the state courts.

We cannot say which particular avenue of state court relief would be most efficacious. That is in the realm of legal tactic and strategy for counsel to consider in light of state procedural law. However, we do note that Section 103–c of the General Municipal Law appears to provide an accelerated procedure for review of a disqualification based on a refusal to waive immunity or testify. Alternatively, review of adverse official action would seem to be available under Article 78 of the Civil Practice Law and Rules. Finally, a plenary suit for injunctive and/or declaratory relief may be prosecuted in the state courts, perhaps even before any further governmental action has occurred. Cf. Fenster v. Leary, supra.

One other point deserves our comment. It has been argued here that the individual plaintiffs lack standing to challenge the constitutionality of the state statutes because none are licensed milk dealers. At most, it is said, they may suffer only consequential harm if the corporations of which they are officers and stockholders are disqualified from bidding on public contracts. Conversely, it has been suggested that, if the corporations with which plaintiffs are associated were the litigants, they would be faced with the contention that a corporation does not have a privilege against self-incrimination and may not claim the personal privilege of its officers or stockholders.

We do not believe that constitutional rights can be impaled on the horns of such a dilemma. The "rule of practice" which bars a litigant—even one who has suffered a "direct substantial injury"—from asserting the constitutional rights of others is not applicable when "outweighed by the need to protect * * * fundamental rights * * *." Barrows v. Jackson, 346 U.S. 249, 255–58, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953). See, e. g., Joint Anti Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 149–154, 71 S.Ct. 624, 95 L.Ed. 817

(1951); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). Cf. Communist Party v. United States, 384 F.2d 957 (D.C.Cir. March 3, 1967).

■■■ If the state attaches consequences to the claim of the privilege against self-incrimination, and the consequences are sufficiently severe and immediate so that the individual's constitutional right has been violated, that right may be championed by another whose injury flows directly from the constitutional deprivation. Indeed, consideration of the personal right may become essential should its alleged impairment result in a denial of due process to the party (here, possibly, the corporation) who may suffer an immediate economic harm. Cf. Pierce v. Society of Sisters, supra; Truax v. Raich, supra.

While we recognize that, as an abstract proposition, a federal court may be the most appropriate forum for the adjudication of federal constitutional claims, overwhelming countervailing considerations on the present record require us to stay our hand. Substantial constitutional issues have been posed concerning the validity of presently uncertain state law; governmental action based on that state law affecting the plaintiffs here is far from final; ample and effective means appear to be available to challenge that action in the state courts when it becomes final and perhaps earlier; and, lastly, the claimed violations of federal constitutional rights can be raised in the state court proceedings or, if necessary, upon ultimate review by the United States Supreme Court.[12]

Plaintiffs' motion for a preliminary injunction and for summary judgment is hereby denied. The action is stayed pending resort to state court proceedings by the plaintiffs and/or their corporations, as they may be advised.

So ordered.

12. It may be noted that the criteria we employ encompass those enumerated in American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts, proposed 28 U.S.C. § 1371(c) (Tent.Draft No. 5 1967).